[No. 31591. *En Banc.* November 15, 1951.]

GROUP HEALTH COOPERATIVE OF PUGET SOUND *et al.,*
*Appellants,* v. KING COUNTY MEDICAL SOCIETY
*et al., Respondents.*[1]

[1]Reported in 237 P. (2d) 737.

*Houghton, Cluck, Coughlin & Henry* and *Mervyn F. Bell,* for appellants.

*Riddell, Riddell, Williams & Madden,* for respondents King County Medical Society *et al.*

*Brightman, Roberts & Holm,* for respondents Public Hospital District No. 1 of King County *et al.*

*Lewis L. Stedman* (of *Stedman & Stedman*), for respondent Swedish Hospital.

*Edgar J. Wright, Morrissey, Eagen & Walsh,* and *John E. Hedrick, amici curiae.*

HAMLEY, J.—This action brings to a head the long and vigorous struggle of the King County Medical Society to curb independent contract medical and hospital service in King county.

In late years the battle has been waged chiefly against Group Health Cooperative of Puget Sound (Cooperative). This organization has proved itself better able than most of its predecessors in the field of independent contract medicine to withstand the opposition of King County Medical

Society (Society). But the Cooperative has apparently tired of what it regards as unfair and illegal fetters placed upon its service and growth. And so, in November, 1949, it brought this suit, asking for an injunction and damages.

Plaintiff Cooperative is a nonprofit corporation, organized under Rem. Rev. Stat., § 3872 [P.P.C. § 457-1] *et seq.*, and a registered health care service contractor under Rem. Supp. 1947, § 6131-10 *et seq.* The Cooperative is under contract with a medical staff composed of twenty licensed physicians, five of whom are plaintiffs in this action. The remaining plaintiff, Amos Huseland, is a member of the Cooperative, and is under contract with the Cooperative to receive pre-paid medical and hospital care. He is also a resident and taxpayer within Public Hospital District No. 1 of King county.

Defendant Society, a nonprofit corporation, is composed of approximately nine hundred fifty licensed physicians residing and practicing medicine in King county, comprising all but a very small number of such physicians. Defendant King County Medical Service Bureau (Bureau) is an unincorporated association composed of approximately six hundred physicians who are members of the Society. The complaint alleges that the membership of the Bureau is so numerous as to make it impracticable to sue individual members by name, and that all doctors named as defendants were accordingly sued individually and as representatives of all other members of the Bureau. Defendant King County Medical Service Corporation (Service Corporation) is a nonprofit corporation organized by members of the Society to furnish medical care and hospitalization to the employees of businesses and industries in the county. Defendant Dr. Charles E. Watts was, at the beginning of this suit, president and trustee of the Society, and defendant Dr. Ralph H. Loe was president-elect and trustee.

Defendant Public Hospital District No. 1 of King county (Renton Hospital) is a municipal corporation organized under Rem. Supp. 1945, § 6090-30 *et seq.*, as amended, and operates a hospital at Renton, Washington. Defendants

Elmo Wright, Rudolph Seppi, and Frank D. Hanley are the commissioners of the hospital district. Defendants Drs. D. J. Laviolette, Edward W. Roberts, M. J. Schultz, and Lloyd F. Lackie are members of the Bureau and of the medical staff of the Renton Hospital. Defendant Swedish Hospital is a nonprofit corporation and operates a hospital in Seattle.

It is alleged in the amended complaint that the Society, Bureau, and Service Corporation and the members of each have combined, agreed, and conspired: to acquire a monopoly in King county in the furnishing of prepaid medical and hospital care; to eliminate competition and restrain trade therein; to bring about a boycott of any person or organization attempting to furnish such care through doctors not members of the Society; and to injure and hamper physicians and surgeons not members of the Society in the practice of their profession, by the regular practice of intimidation, coercion, threats, libel, and slander. It is alleged that, in pursuance of this combination, agreement, and conspiracy, these defendants committed several kinds of overt acts. These alleged overt acts and the evidence concerning each will be separately discussed at a later point in this opinion.

It is also alleged in the amended complaint that defendants Swedish Hospital and Renton Hospital, and defendant commissioners of Renton Hospital, have entered into the combination, agreement, and conspiracy described above. It is alleged that the part played by defendant hospitals in such combination and conspiracy has consisted in the adoption of by-laws or regulations, submitted by members of the Bureau at the instance of the Society and Service Corporation, under which access to the respective hospitals has been denied to any physician not a member of the Society. It is further alleged that defendants Drs. Laviolette, Roberts, Schultz, and Lackie actively participated in the formulation, adoption, and enforcement of such by-laws or regulations, solely with the intention of consummating the alleged conspiracy, and to injure plaintiffs.

As a basis for injunctive relief, it is alleged that, by reason of the wrongful acts of defendants, plaintiffs have been

subjected to serious and irreparable injury and damage, for which their remedy at law is wholly inadequate. Plaintiffs also ask for monetary damages in the sum of $4,500 by reason of expenses incurred by the Cooperative in securing the services of doctors from other localities when prevented, through defendants' course of conduct, from employing local doctors, and in the sum of $15,000 each, suffered by each of the five plaintiff doctors, by reason of injury to professional reputation and standing in the community, mental distress, and humiliation. The total monetary damages prayed for aggregate $79,500.

The answers filed on behalf of the defendants in substance deny the allegations of the amended complaint respecting an alleged combination, agreement, and conspiracy, the alleged motives therefor, the alleged overt acts in pursuance thereto, and the alleged resulting damages. The answer filed on behalf of the Society, Bureau, Service Corporation, and defendants Drs. Watts and Loe, also contains an affirmative defense in which is recounted the efforts of the Society, over the years, to curb so-called "unethical" prepaid contract practice of medicine.

It is also alleged in this answer, by way of affirmative defense, that one corporation which in 1933 was engaged in "unethical" contract practice in King county, brokering medical service, was owned by a layman, one Prendergast, operating under various corporate names; that Prendergast became wealthy as a result of this operation, and sold the business to a group of individuals, who likewise made a substantial sum of money from the profits of the corporation; and that plaintiff Cooperative has since bought the good will, corporate stock, and business of the Prendergast corporation, and is now continuing to operate the same as a commercial enterprise in violation of the ethics of the medical profession and in violation of its charter as a charitable corporation.

The reply puts in issue all of the adverse allegations of the affirmative defense summarized above.

The trial, which began on May 24, 1950, lasted four and a half weeks, and is recorded in a twenty-three-volume

statement of facts. At the conclusion of the trial, the court took the case under advisement. Three weeks later, the trial court issued its memorandum opinion, in which it was indicated that the action would be dismissed. No formal findings of fact and conclusions of law were entered. However, the decree, dated July 26, 1950, which dismisses the action with prejudice, contains a provision adopting, as the court's findings of fact and conclusions of law, the memorandum opinion of July 14, 1950.

Plaintiffs have appealed. They rely upon fourteen assignments of error. The first eight assignments challenge specific findings of fact. The next five assignments contest specified conclusions of law. The final assignment is general in nature, reciting that the court erred in making and entering its decree providing that the action be dismissed with prejudice.

■ This being an action in equity, findings of fact were not necessary at the time this decree was entered. *Thomas v. Hensel,* 38 Wn. (2d) 457, 230 P. (2d) 290. Where such findings have been entered, however, we have given them great weight. *State ex rel. Bradford v. Stubblefield,* 36 Wn. (2d) 664, 220 P. (2d) 305, 17 A. L. R. (2d) 1258.

■ We have previously expressed disapproval of the practice of attempting to enlarge the formal findings of fact by reference to a memorandum decision. *In re Sipes,* 24 Wn. (2d) 603, 167 P. (2d) 139. See, also, 2 Bancroft's Code Practice and Remedies, p. 2161, § 1682, quoted with approval in *Clifford v. State,* 20 Wn. (2d) 527, 148 P. (2d) 302.

The practice of adopting the memorandum opinion as the complete findings of fact and conclusions of law is still more objectionable. This is particularly true in the instant case, where it becomes necessary to glean through a fifty-one-page memorandum opinion, and to segregate recitals of fact from interspersed discussions of pleadings, evidence, and points of law, in order to arrive at the actual findings of fact intended by the court. Moreover, after completing this process, we learn that the findings on many important points consist of statements that plaintiffs' allegation "is not sustained by the evidence," no attempt being made to indi-

cate, affirmatively, what the evidence does show. On other important points, we are unable to discover even this much of a finding.

 In what is said above no criticism is intended, since, as just indicated, findings of fact were not required under our rules. Our purpose has been to indicate why we must consider that no findings of fact or conclusions of law were entered herein. The assignments of error, accordingly, will not be discussed with reference to individual findings and conclusions drawn from the memorandum opinion. Instead, we will regard the assignments as presenting the general question of what the facts are with reference to the matters and things placed in issue by the pleadings, and whether such facts give rise to any cause of action which should have been recognized and enforced by the trial court. This is the procedure which was followed in *In re Sipes, supra.*

In view of the voluminous record, it is impracticable to present and discuss the testimony on all of the individual questions of fact, some of which are in serious dispute. In several instances, however, where it has been considered helpful in indicating the precise situation which existed, reference will be made to specific testimony and exhibits. The summary set out below represents our findings of fact after weighing all the testimony and considering the trial court's memorandum opinion.

The King County Medical Society was incorporated in 1909. It is one of the component societies of the Washington State Medical Association. The state association, in turn, is one of the constituent associations of the American Medical Association (A. M. A.). The A. M. A. has created various bureaus for the handling of details, such as the bureau of legal medicine and legislation, and the council on medical education and hospitals.

A few years after the incorporation of the Society, its members became concerned regarding the growth of contract medical service in King county. Contract medicine has been defined in the "Principles of Medical Ethics of the A. M. A., 1949," as follows:

"Contract practice as applied to medicine means the practice of medicine under an agreement between a physician or a group of physicians, as principals or agents, and a corporation, organization, political subdivision or individual, whereby partial or full medical services are provided for a group or class of individuals on the basis of a fee schedule, or for a salary or for a fixed rate per capita."

Under this broad definition, contract practice may be based upon an agreement with an individual or a number of disassociated individuals; a group of individuals organized on a co-operative, fraternal, or other basis; or a public or private employer. While entertaining the view that almost all of these kinds of agreements involve some evils, the Society has been chiefly concerned with contracts involving private employers. These agreements, known as "industrial contracts," usually provide that the employees of such employer may, by subscribing to the plan, and in consideration of a specified monthly payment per subscriber, made by the employer or made by the employee by means of a payroll deduction, receive stipulated medical service.

The Society has not condemned all industrial contracts. It has, in fact, sponsored and promoted industrial contract practice of a certain type, as will be later developed. The Society, however, has condemned, and over a long period of years has sought to curb, industrial contract practice which, in its opinion: deprives patients of free choice of physicians; excludes the majority of the profession from participation in the plan; results in the rendition of substandard or inadequate medical service; provides inadequate compensation to the profession; brings substantial profits to laymen; constitutes unfair competition in the profession; or is, in any other respect, detrimental to what the Society regards as the best interests of the public and of the medical profession. Industrial contract practice which results in any of these asserted evils is regarded by the Society and its members as "unethical."

The record contains a great deal of testimony, presented principally by respondents, bearing upon the claimed evils of contract medicine, as practiced by numerous individuals

and organizations prior to the advent of the Cooperative. Without attempting to review this testimony, it is sufficient to say that it establishes a reasonable basis for the conclusion that contract medicine, as practiced by the predecessors of the Cooperative, produced conditions and results which were inimical to the public interest and to the best interests of the medical profession.

After some preliminary study, the Society, in February, 1933, appointed a committee to deal with the problem of industrial contract practice. The report of this committee, made to the members on March 20, 1933, recommended that, of the several methods which might be pursued, the only practical one was:

" . . . to organize the members of the profession into a large group to go into competition with the existing organizations contracting for medical, surgical and hospital care, covering the low income group. . . ."

The members, after discussing the committee report, unanimously adopted a motion:

" . . . that the King County Medical Society approve the formation, and empower the committee now acting in behalf of the Society for the study of the industrial situation, to foster the formation of such a permanent organization to promote medical, surgical and hospital service for people in the low wage income groups, to which none but members of the King County Medical Society shall be admitted as participants, and that such an organization shall be entirely divorced from the King County Medical Society as a body."

Pursuant to this resolution, the Society, in April, 1933, caused the nonprofit Service Corporation and the unincorporated Bureau to be organized. The Bureau is composed of doctors who are under contract with Service Corporation to furnish prepaid contract service to persons covered by industrial contracts negotiated by Service Corporation. The Bureau doctors receive compensation for such services in the form of fees paid to them by Service Corporation.

Both the Bureau and Service Corporation have at all times been composed exclusively of Society members, all

members of the Society being urged to join. There is close coordination between the three organizations, including joint meetings. Membership in the Bureau is denied to doctors who engage in any competing industrial contract practice, and Bureau members who turn to such practice are dropped from membership.

Service Corporation offers industrial contracts to various employers in King county. A subscribing employee may, in addition to receiving prepaid medical service for himself, elect to obtain such service for his entire family, and also may elect to receive prepaid hospitalization for the family. The monthly charge depends upon whether the employee elects to obtain these additional services. Lay salesmen are engaged for the purpose of negotiating such contracts. They were originally compensated on a commission basis, but are now on salary, twelve such salesmen being presently employed.

The availability of prepaid service offered by Service Corporation is confined to persons as determined from time to time by the Society, Bureau, and Service Corporation. Originally, only those earning less than one hundred fifty dollars a month could secure prepaid service through Service Corporation. This figure was increased from time to time, and at present such service is available to employees earning not to exceed five hundred dollars a month. The medical director of Service Corporation conceded that the competition afforded by the Cooperative in recent years has been a factor in bringing about the liberalization of Service Corporation's contracts in this respect.

At the present time, Service Corporation administers some twenty-five hundred industrial contracts in King county, involving approximately eighty thousand subscribers for medical care. The income under these contracts aggregates about $375,000 a month. The net income, after payment of expenses incurred by the corporation, is distributed to Bureau doctors in the form of fees. In the view of Society officials, this industrial contract plan eliminates

the objectionable features of contract practice as it existed prior to 1933.

While the Society has long exerted its influence in opposition to industrial contract practice, it did not originally deny membership to doctors, otherwise qualified, who engaged therein. Consequently, when the Society established its competing industrial contract plan in 1933, there were from fifty to seventy-five members then engaged in such practice under other plans. From that time forward, however, the Society adopted a careful screening process for the purpose of denying membership to all new applicants engaged in such practice.

In order to force discontinuance of such practice by those already enjoying Society membership, or by those who thereafter sought to join the Society, Article III, § 8, of the by-laws, relating to the disciplining of members, was at that time amended by adding the provision shown in italics below:

"A member who has been found guilty of a criminal offense or of gross misconduct, either as a physician or as a citizen; or whose license to practice medicine in this state has been revoked or suspended by the State Board of Examiners; or who has committed any act which may be derogatory to the medical profession; or who shall refuse or neglect to obey the regulations of this society, or who knowingly gives false testimony as an ordinary or expert witness; or who has violated any of the provisions of these by-laws; or who shall violate the code of ethics of the American Medical Association as the same is now written, or as it may hereafter be changed; or who shall be guilty of any disloyal, seditious or treasonable utterance, writing or act against the United States, *or who shall engage in contract practice unless the same shall previously have been authorized by the Board of Trustees of this Society, or who as physician or surgeon shall serve on the staff of or perform work for the patients of, or shall perform work in, any institution or group or organization unless such services or work shall previously have been authorized by the Board of Trustees of this Society, shall be liable to censure, suspension or expulsion.* Censure, suspension or expulsion shall require a two-thirds affirmative vote of the members present and voting at a regular meeting. Written notice of the charges

preferred must be given to the accused, and to each member of the society, ten days in advance of such meeting. Opportunity for the accused to be heard in his own defense shall be given before a vote of the Society is taken on his censure, suspension or expulsion.

"A member under suspension may be reinstated to active membership by a two-thirds affirmative vote of members present and voting at a regular meeting."

This by-law continues in effect at the present time. The only plan ever authorized under this by-law is that of Service Corporation. The by-law amendment referred to, together with the new screening process on applications for membership, proved very effective in curbing industrial contract practice other than that sponsored by Service Corporation. Most members who were then engaged in "unauthorized" contract practice, discontinued such practice. However, two residents of Tacoma, Dr. A. W. Bridge, operating his Bridge Clinic, and L. G. Prendergast, operating his State Clinic, later named Medical Security Clinic, Inc., continued to carry on industrial contract medicine in King county in competition with the Society's Service Corporation.

The Society's board of trustees, on November 11, 1936, adopted a motion that the following resolution be presented to the Society:

"Resolved that the Board of Trustees consider it unethical for any member of the Society to consult with any physician who is not a member of the Society, doing contract practice on any then contract patient."

The record does not reveal whether this resolution was adopted, or intended for adoption, by the membership of the Society. In any event, the policy expressed in this board motion, although apparently not rigidly enforced, was thereafter followed in general by the members of the Society.

This brings us down to the year 1946, when the Cooperative was organized by leaders in granges, labor unions, and consumer co-operatives in the area. Each member of the Cooperative, by paying the required monthly dues, is eligible to receive prepaid medical and hospital service for

himself, members of his family, and dependents. The Cooperative also renders service under industrial contracts. It is with respect to these industrial contracts that friction has developed between appellants and respondents. The Society and its affiliates are apparently willing to tolerate the Cooperative's prepaid service to its own members, providing it will discontinue the industrial contracts. It is not feasible, from an economic standpoint, however, for the Cooperative to discontinue its industrial contract practice, even if the Cooperative were otherwise willing to do so.

The Cooperative now has industrial contracts with about three hundred business firms, representing a coverage of approximately nine thousand subscribing employees. The contracts provide for specified medical and hospital service to the employees and members of their families. The Cooperative's industrial contracts appear to offer a more complete medical service than do those of Service Corporation. This is particularly true in the field of family care and preventive medicine. The time limitations for medical service under the Cooperatives's contracts are also more liberal. Reference has already been made to the fact that the absence of a salary restriction in the Cooperative's industrial contract plan has been a factor in bringing about a liberalization of Service Corporation's salary restriction.

The Cooperative employs three salesmen, who devote their time largely to selling industrial contracts. The Cooperative does no advertising, but issues a brochure which explains the plan and emphasizes the reasons why employees should subscribe to it. There is nothing in the terms of the Cooperative's contract which prevents nonsubscribing employees of an employer who has signed with the Cooperative from obtaining prepaid medical service from Service Corporation or some other agency, or from obtaining such service on the customary private fee basis. The administrative and financial matters of the Cooperative are in the hands of a manager, who is directly responsible to a board of trustees.

The Cooperative, as previously indicated, has in its employ twenty licensed physicians. The relationship between

the Cooperative and its professional staff is regulated by the organization's by-laws, and by a contract between the two. Article IV, § 1, of the by-laws provides:

"Section 1. Neither the Board of Trustees nor the membership shall supervise, regulate or intervene in the professional relationships between the physicians and their patients."

The testimony is undisputed that this provision had been observed at all times "to the letter."

The contract between the Cooperative and its staff provides, among other things, that: staff members are to be compensated on a salary basis according to classifications and a salary schedule attached to the contract; staff members are subject to reclassification by vote of the staff; they may retire at the age of sixty-five or more years, with retirement pay graduated according to length of service, the retirement trust fund being financed by payroll deductions and matching sums contributed by the Cooperative; excess of gross income over operating expenses, after payment of salaries, is to be divided equally between the Cooperative on the one hand, and the staff and other employees on the other hand, it being provided that the staff's and employees' share shall not exceed one-eighth of the total salaries of staff members and employees; the balance, to be retained by the Cooperative under this formula, is to be utilized "for the improvement of its services and other corporate purposes of a charitable and non-profit nature."

All doctors retained by the Cooperative are satisfied with their employment, and there has been no dispute of any kind with them. The annual salary range for staff members presently runs from $6,600 to something over $12,000. The Cooperative had never, up to the time of trial, accumulated an excess of gross income over expenses which could be distributed as a bonus under the provision referred to above.

The chief of the Cooperative's professional staff gave the following reasons why the staff members feel they can render better service under the Cooperative's group prepayment plan than is usually possible where doctors carry on

separate practice: increased opportunities for, and convenience in, effectuating referral of patients to other doctors to take advantage of various specialties; access to more and better equipment and laboratory facilities; improved quality of service because of constant surveillance by other members of the staff; opportunities for consultation, staff conferences, refresher courses, and post-graduate studies; better organization of time as, for example, the rotation of emergency night-call service; greater incentive to give patients proper treatment; security of professional income regardless of daily patient load; and disassociation of the business aspects of the service, so that the doctors may devote themselves entirely to professional matters. These objectives are set forth, in general terms, in the contract between the Cooperative and its staff.

In the fall of 1946, the Cooperative bought the capital stock of Medical Security Clinic, Inc. With this purchase, the Cooperative acquired ownership of industrial contracts which grossed about $300,000 annually, and a fifty-five-bed hospital in Seattle (then known as St. Luke's), valued at $140,000. This hospital was thereafter known as Group Health Hospital. Medical Security Clinic had been formed in 1931 as a business corporation, by a layman, L. G. Prendergast, to whom reference has previously been made.

The Cooperative's purpose in purchasing Medical Security Clinic was apparently two-fold: to acquire needed hospital facilities; and to obtain a large block of industrial contracts. It was recognized that the Cooperative's income from its member-patients was insufficient, and that future success depended upon developing an industrial contract practice. The Cooperative made the purchase by acquiring the stock of Medical Security Clinic, Inc., rather than by buying its facilities and good will, in order to obtain the clinic's leasehold on certain office space, the lease containing a covenant against assignments.

The staff of Medical Security Clinic was retained, and it was the members of this staff who entered into the contract with the Cooperative, referred to above. In this sense, the transaction represented an "amalgamation" or "joining of

forces" between the two organizations, as found by the trial court. This does not mean, however, that the Prendergast policies, so bitterly criticized by the Society, were continued in effect after the Cooperative acquired the capital stock of Medical Security Clinic, Inc. As previously noted, Prendergast was out of the picture before this purchase was consummated. After the purchase, the Cooperative's policies, as set forth in its by-laws and in the staff contract, governed.

All medical service was thereafter rendered in the name of the Cooperative. While the name "Medical Security Clinic Division" also appears in the heading of industrial contracts thereafter negotiated, this is apparently only for the purpose of establishing the Cooperative as the clinic's successor in interest. Medical Security Clinic, as a corporation, has been inactive since the purchase. It performs no business whatsoever except to elect officers and file Federal income tax returns. It has no employees, maintains no bank account, and renders no medical service.

Considerable testimony was offered by respondents tending to show that doctors employed by contract groups frequently lacked competence, and that the quality of service rendered by contract doctors was often unsatisfactory. Examination of this evidence indicates, however, that much of it relates to organizations other than the Cooperative or Medical Service Clinic, and pertains to incidents occurring many years ago. The testimony of this character which has direct reference to Medical Security Clinc is, in the main, confined to the period prior to the acquisition of the clinic by the Cooperative.

Concerning the quality of service rendered by Medical Security Clinic since it was taken over by the Cooperative, testimony was offered by several members of respondent Society. This testimony appears to be based largely upon hearsay information coming from dissatisfied patients, isolated instances of improper diagnosis or treatment, and frank self-criticism by members of the staff for the purpose of bringing about improvements in medical standards. In all of these respects the Cooperative and Medical Security

Clinic would seem to be in no different situation than the average medical practitioner and hospital in King county. It is also quite apparent that the opinions expressed by most of the witnesses for the Society, concerning appellant's professional standards, find their real basis in the witnesses' deep and sincere conviction that all contract practice unauthorized by the Society is "unethical."

It was conceded by several witnesses, called by respondents, that there was both good and bad in the practice of physicians. connected with competing contract groups, just as there was in the practice of those not connected with contract medicine. Yet it appears that neither the Society, nor Service Corporation, nor any of the witnesses called by respondents has made an inspection or examination of the Cooperative's facilities, records, contract procedures, or methods of professional practice, for the purpose of determining whether its particular type of practice was good or bad. The Cooperative has long invited and urged such a review. This situation is graphically illustrated by the following cross-examination of Dr. Holloway, who was chairman of the Society's membership committee in 1948:

"Q. Let me ask you this question. At the time that the applications of any of those men were up before you as a member of the Society, did you ever take any step at all to inquire as to the present status of practice in this group? Did you ever take any step to inform yourself what type of medicine Dr. McNeel was practicing, or any other of those men that were connected with Group Health Cooperative? A. I don't believe so. Q. As a matter of fact, you didn't even ask them about it, did you? A. I think it was routine to investigate the school training that they had, their hospital training, their specialty type of training, and where they were practicing. Q. But as a matter of fact, the important thing would be the level of their professional practice at the time that the applicant is before your committee? Isn't that true? A. Well, I imagine, yes. Q. How do you account for the fact then that you did not make any inquiry at all as to the nature of the practice they were conducting? A. Frankly, I don't know."

Each of the twenty physicians and surgeons comprising the present professional staff of the Cooperative, including

ten specialists, is duly licensed to practice medicine in the state of Washington. Each is a holder of a physician's, or physician's and surgeon's certificate issued in accordance with law upon due showing of moral character and professional qualifications. Each holds the degree of M.D. from a medical school which has been accredited and approved by the association of American medical colleges and the council of medical education and hospitals of the A. M. A. The certificate of each such physician has never been suspended or revoked, and is now in full force and effect.

On June 19, 1948, the A. M. A. officially entered Group Health Hospital on the A. M. A. hospital register. In order to obtain such registration, the medical staff and hospital plant and facilities must have conformed to the requirements set forth in an A. M. A. publication entitled "Essentials of a Registered Hospital." With respect to qualification of medical staff, this document provides:

"III. MEDICAL STAFF

"1. Since the medical staff is the most important factor in the delivery of medical service to patients, too great care cannot be exercised in the selection of staff members. The staff should be limited to physicians holding the degree of doctor of medicine from medical colleges acceptable to the Council on Medical Education and Hospitals, having satisfactory qualifications as to training, licensure and ethical standing, and to dentists who are graduates of recognized dental colleges and whose professional ability and standing are known to the medical staff."

Before entering Group Health Hospital in the A. M. A. hospital register, an investigation was made on January 14, 1947, by the council on medical education and hospitals of the A. M. A. A report covering this investigation was followed by affirmative action registering the hospital. It may be fairly inferred from this that the hospital plant, facilities, and staff were found to be in compliance with A. M. A. standards.

We conclude from the evidence summarized above that respondents have not established that appellant doctors, Medical Security Clinic Division, and Group Health Hospital now render professional service of a quality substan-

tially below that rendered by the average physician, surgeon, clinic, or hospital in the community.

As indicated by the facts set out earlier in this opinion, the Society's opposition to "unauthorized" contract practice stems from its own studies of the problem, made in the 1920's and 1930's, whereby it was concluded that all such contract practice was "unethical." The question arises, and is dealt with extensively in the record, as to whether this attitude respecting contract practice is today shared generally by other local medical societies and by the A.M.A.

The testimony dealing with the local society relationships indicates that doctors associated with contract medicine organizations in many cities are in good standing with their respective local societies. Among the cities where this situation exists are: Tacoma, Washington (Western Clinic); Vancouver, Washington (Permanente); New York, N. Y. (Health Insurance Plan of Greater N. Y.); Chicago, Illinois (Community Health Center); St. Louis, Missouri (Health Institute); and Oakland, California (Permanente).

Regarding the attitude of the A. M. A. towards the type of contract practice carried on by the Cooperative, a more extended discussion is necessary. Under A. M. A. regulations, the Cooperative was required to satisfy the A. M. A. that Group Health Hospital was operated in compliance with the A. M. A. Principles of Medical Ethics before that hospital could be registered. The A. M. A. inspector who made the report for the council on medical education and hospitals called specific attention to the method of contract practice employed by the Cooperative. He submitted to the A. M. A., without comment, the question of whether this constituted compliance with the A. M. A. code of ethics. The fact that, with this information in its possession, the A. M. A. did thereafter register the hospital, tends to indicate that A. M. A. officials do not regard the Cooperative as providing "unethical" service, in so far as A. M. A. standards are concerned. Under A. M. A. procedures, however, such registration did not operate to deprive the Society

from making its own determination of the ethics practiced at Group Health Hospital.

Between 1946 and 1949, the A. M. A.'s council on medical service conducted studies relating to prepaid medical and hospital plans of all kinds. This survey, when completed, indicated that some one hundred seventy-one lay-sponsored voluntary health plans had been organized in forty-three states and were serving an estimated 1,600,000 persons. A special committee of the council then met with a similar committee representing the Cooperative Health Federation of America and various labor and grange organizations. The purpose of this meeting was to prepare suggested standards applicable to all such prepaid plans. As a result, there was formulated a set of principles commonly known as the "Twenty Points." These principles were approved by the house of delegates of the A. M. A. at its annual meeting in June, 1949, and were published in the June 25, 1949, Journal of the A. M. A., at page 686.

The Twenty Points provide, among other things, that the prepaid medical plan shall comply with the Principles of Medical Ethics of the A. M. A. A revised form of these Principles was adopted in 1949, at the same time that the Twenty Points were approved. Article VI, § 3, of these 1949 Principles, entitled "Contract Practice," reads in part as follows:

"Contract practice *per se* is not unethical. Contract practice is unethical if it permits of features or conditions that are declared unethical in these Principles of Medical Ethics or if the contract or any of its provisions causes deterioration of the quality of the medical services rendered."

Section 4 of the same Article VI, entitled "Free Choice of Physician," provides:

"Sec. 4—Free choice of physician is defined as that degree of freedom in choosing a physician which can be exercised under usual conditions of employment between patients and physicians. The interjection of a third party who has a valid interest, or who intervenes between the physician and the patient does not *per se* cause a contract to be unethical. A third party has a valid interest when, by law or volition,

the third party assumes legal responsibility and provides for the cost of medical care and indemnity for occupational disability."

The importance of the last-quoted section lies in the fact that the Society's antagonism to all "unauthorized" contract medicine plans, including the Cooperative's plan, is predicated primarily upon the premise that they preclude "free choice of physicians."

The Cooperative's plan permits individuals to determine whether or not they wish to become beneficiaries under the plan; permits beneficiaries free choice of all physicians and surgeons participating in the plan; permits such beneficiaries (at their own expense) to go to other physicians and surgeons for treatment of any particular ailment without terminating the plan; and permits such beneficiaries to terminate their participation in the plan by simply declining to pay the next month's dues.

The Cooperative plan does not permit beneficiaries to receive, as part of their benefits under the contract, the services of nonparticipating physicians. It is to be noted, however, that the Service Corporation plan also restricts beneficiaries thereunder to a choice limited to participating physicians. While such beneficiaries have a choice of six hundred fifty doctors who have joined the Bureau, they are denied the right to choose any of the three hundred fifty or so members of the Society who have not elected to join the Bureau, or any of the twenty Cooperative doctors who are, so long as they continue their present practice, denied the right to join the Bureau.

Thus, measured by the governing Principles, the Cooperative's industrial contract plan appears to accord "free choice of physician" quite as much as does the Service Corporation plan. That the right of choice, although so limited, conforms to the A. M. A. Principles quoted above, is indicated by paragraph 13 of the Twenty Points. This paragraph provides, in part, that the beneficiary shall, within reasonable geographic and professional limitations, "have free choice among *participating* physicians." (Italics ours.)

In addition to the question of whether the Cooperative plan conforms to the A. M. A. ethical standard regarding "free choice of physician," there are other A. M. A. ethical standards which must be considered. Paragraph 12 of the Twenty Points reads as follows:

"12. Any duly licensed physician in the community who wishes to participate in the plan, who meets its professional and personnel standards and who agrees to abide by its terms and the requirements of its beneficiaries shall be admitted to the plan."

Respondents contend that the Cooperative plan fails to comply with this provision, since only a limited number of salaried physicians are permitted to participate. It will be observed that the principle here in question is not "free choice of physician" but "equal access to patients." Dr. McNeel, who participated in the drafting of the Twenty Points, testified that the committees which worked on this understood that paragraph 12 did not require a prepaid medical group which utilizes salaried physicians and surgeons to employ more doctors than were required to perform the service.

This appears to be the only interpretation of the provision in question which is consistent with the Twenty Points, read as a whole. Paragraph 11 thereof provides that participating physicians may be compensated in any manner not contrary to the Principles of Medical Ethics relating to contract practice. Article VI, § 3, of the 1949 Principles provides that compensation may be on the basis of a fee schedule (as in the Service Corporation plan), or for a salary (as in the Cooperative plan), or for a fixed rate per capita. That it is perfectly ethical for physicians to be compensated by salary, is further demonstrated by the fact that several members of the Society are employed in Seattle hospitals on a salary basis.

It follows that, salaries being permissible, it would be unreasonable to construe paragraph 12 of the Twenty Points as requiring the organization to offer salaried positions to every local doctor who desires to participate. The words

"personnel standards" must mean, as Dr. McNeel testified, that the number and special qualifications of participating doctors would necessarily be governed by the number and kind of beneficiaries to be served. As so interpreted, the Cooperative is not violating paragraph 12 of the Twenty Points.

Respondents also make the contention that the Cooperative violates paragraph 16 of the Twenty Points. This paragraph stipulates that all services rendered by the participating physicians, not included in the beneficiary's contract, shall be payable by the beneficiary to the participating physician on a fee-for-service basis. The practice followed by the Cooperative is for the chief-of-staff, in consultation with the general manager, to fix the fee for any such service. The fee is then paid to the Cooperative and not to the doctor performing the service. Such doctor may ultimately share in such plan under the Cooperative's bonus plan.

Paragraph 16 does not require that the fee be set by the doctor rendering the service. However, the paragraph does require that the entire fee, so set, be paid to the doctor who renders the service. This rule is undoubtedly intended principally to prevent lay persons from profiting from such professional service. There is no evidence that lay persons benefit from the professional services rendered by appellant physicians. In any event, the record does not indicate that any appreciable amount of such service is rendered on a fee basis. The contract between the doctors and the Cooperative requires them to devote their entire time to contract practice. Hence, if there has been any technical violation of the rule prescribed in paragraph 16, it has been inconsequential in extent and not productive of the evils against which the provision is directed, and should, under the *de minimis* principle, be disregarded.

One or two members of the Society expressed the view that the contracts which the Cooperative has with its members probably conform to the Twenty Points, but doubt was expressed concerning the Cooperative's industrial contracts.

No basis is disclosed in the record for drawing a distinction, in principle, between the Cooperative's member contracts and its industrial contracts. Similar service is rendered under both types of contracts, utilizing the identical personnel and facilities. The relations between physician and patient are the same under either type of contract. The salaries received by the Cooperative's professional staff cover services rendered to beneficiaries under both contracts.

The one basic difference between the two types of contracts involves no principle but only an economic factor: The Cooperative's industrial plan is in competition with the Service Corporation plan, and its membership plan is not.

The two principal objections which respondents have to the Cooperative's industrial contract practice have been discussed above. These relate to the claimed inferiority of service and facilities, and the contention that the Cooperative's plan violates the A. M. A. canons of ethics. It is our conclusion that the evidence fails to support either objection.

Respondents correctly point out, however, that the ethical standards established by the A. M. A. are not intended to be binding upon local medical societies. They are free to set higher ethical standards. Moreover, the application of the ethical standards in individual cases is left largely to local societies, which may take into account the particular facts and circumstances which may be involved.

Consideration has therefore been given to a number of other objections which the Society, Service Corporation, and Bureau present concerning the Cooperative and contract practice in general. Respondents have discussed these miscellaneous objections under the following headings: unreality of consent of contractees; extravagant promises by salesmen; bribery to secure contracts; lack of scientific meetings; profit to third party; lack of personal touch between physician and patient; solicitation; tendency to make money out of contracts; underbidding to secure contracts; and control by lay operators.

The evidence offered by respondents in support of these objections relates almost entirely to other groups and earlier times, or to the operations of Medical Security Clinic prior to its purchase by the Cooperative. The only evidence pertaining specifically to the Cooperative relates to the matter of "solicitation." This evidence consists of the testimony of Don A. Northrop, general manager of Group Health Clinic and Group Health Hospital, that his organization is soliciting new subscribers and new industrial accounts. There is nothing in the record to indicate that there is any misrepresentation, overselling, or other impropriety with respect to the way in which this soliciting is done. There would seem to be no more objection to such solicitation, from the standpoint of professional ethics or general public interest, than in the case of Service Corporation's solicitation. The latter organization engages a force of paid salesmen, and does extensive newspaper and radio advertising in the sale of its industrial contracts.

We find that the evidence bearing upon the miscellaneous asserted objections set out above fails to establish any grievance against the Cooperative based upon ethical considerations.

As previously indicated, the Cooperative provides service under two kinds of contracts—its membership contracts and its industrial contracts. Both kinds would seem to fall under the ban of amended Article III, § 8, of the Society's by-laws, quoted above. Yet the Society has made it clear time and again that appellant doctors and their associates will be accepted into the Society if they discontinue the industrial practice, and even though they continue practice under their membership contracts. It has already been noted that competition between the Service Corporation on the one hand, and the Cooperative on the other, pertains only to industrial contracts.

This fact alone is sufficient to indicate that the Society's primary motive in opposing the Cooperative and its staff members is to restrain the competition which the Cooperative provides through its industrial contracts. The So-

ciety's attitude in tolerating contract practice by members who serve fraternal organizations and petroleum companies (it appearing that no effective competition resulted) is also indicative of the Society's underlying purpose referred to above.

The Society's purpose may actually extend further than just indicated. The members and officers of the Society, Service Corporation, and Bureau unquestionably are aware of the ·fact that the Cooperative's membership program would also be jeopardized if its industrial contract practice can be stopped or seriously curbed. That membership program is in competition with the regular fee-for-service practice of all members of the Society. Thus there is reason to believe that the purpose of the Society in restraining competition extends to the ultimate extermination of all contract practice by the Cooperative. Whether or not the Society's purpose extends this far, it is altogether likely that the result of its present policy, if achieved, will be that far-reaching.

Relative to the matter of competition between prepaid medical plans, the evidence further indicates that it is the policy of the A. M. A. that "the people should be free to purchase the type of health security they desire." Pursuant to that policy, the A. M. A. developed its Twenty Points as a guide to be followed in setting up such programs. There is nothing in those Twenty Points or in the Principals of Medical Ethics, 1949, to indicate that mere competition between prepaid medical plans is contrary to the best interests of the profession or the general public.

Quite to the contrary, the A. M. A., through its official Journal, has been openly critical of those who would use the A. M. A. Principles of Medical Ethics as a means of curbing such competition. Editorial comment in the July 16, 1949, A. M. A. Journal contains this statement regarding the impact of the 1949 Principles upon contract practice throughout the country:

"The statements now prevailing permit experimentation with changes in the method of medical practice beyond some restrictions which prevailed formerly. . . .

"The fundamental principle that the physician shall not dispose of his professional attainments or services under terms or conditions which permit exploitation of the services for the financial profit of a corporation or lay agency still obtains. The only type of contract practice specifically condemned is that which may result in deterioration of the quality of the medical services rendered.

"Instances have occurred in which physicians, for political, commercial or emotional reasons, have endeavored to utilize the Principles of Medical Ethics as a means of producing embarrassment, distress or loss of reputation of other physicians whom they envy or whose open competition they fear. The Principles of Medical Ethics were not designed for any such purpose, and the attempt to utilize the principles of ethics for such purposes may well be in itself unethical."

Appellants have alleged that respondents have committed overt acts of various kinds which have proved directly injurious to appellants and which entitle the latter to monetary damages and injunctive relief. The answers filed by respondents deny all these allegations of the complaint. The record contains a great deal of evidence bearing upon these matters. We will state our findings on this branch of the case under headings which correspond to the allegations concerning such overt acts, as set out in the amended complaint.

*First* overt act charged: That the Society, Service Corporation, and Bureau prescribe that no physician or surgeon not a member of both the Society and the Bureau can perform service for persons under contract to receive services from the Service Corporation.

The trial court made no finding in its memorandum opinion concerning the evidence bearing upon this allegation. In the brief filed on behalf of these respondents, it is admitted that this allegation is true as to Service Corporation. The evidence also establishes, beyond dispute, the truth of this allegation, and we so find.

*Second* overt act charged: That the Society has threatened to expel any doctor who furnishes prepaid medical care in competition with Service Corporation.

The trial court's memorandum opinion contains no finding relative to this allegation.

Reference was made, earlier in this opinion, to the amendment of Article III, § 8, of the Society's by-laws, adopted in 1933, under which members who engage in contract practice which has not been authorized by the Society's board of trustees, are subject to censure, suspension or expulsion. This by-law is still in effect, and the only plan of contract practice which has ever been "authorized" has been that of Service Corporation. Several officers and members of the Society testified that, under this by-law, any physician connected with a clinic competing with Service Corporation has been given the alternative of disassociating himself from it or facing disciplinary action by the Society.

The opinion has been expressed above that the primary purpose of this enforcement program was to curb competition with the Service Corporation plan. The correctness of this view is indicated by the facts already discussed. It is further substantiated by an editorial which appeared in the Society's official bulletin, issue of February 1, 1937. This editorial reads, in part, as follows:

"The success of this plan depends upon the Bureau having a monopoly of the contract practice, no members of the society being permitted to engage in individual contract work.

. . .

"The successful operation of this plan is illustrated in King County, where the Society does not permit any of its members to engage in private contracts and the Board of Trustees has passed a resolution declaring it unethical for any member to consult with or assist a man engaged in such work."

We find that the evidence fully sustains the allegation of threatened expulsion of members, as set out above.

*Third* overt act charged: That respondents caused to be adopted and enforced by each of the major hospitals in King county, including respondents Swedish Hospital and Renton Hospital, a by-law or regulation restricting to members of the Society the right to become staff members or to practice therein.

In its memorandum opinion, the trial court inferentially found that the King county hospitals did, for the most part, restrict staff membership to Society members. The court found that this was only natural in view of the fact that the great majority of the doctors of King county belong to the Society and have the same standards of professional ethics. The trial court also found that the evidence fails to disclose that any agreement or understanding was ever entered into between the Society and the hospitals that they would not admit to their staffs any doctor who was not a member of the Society, or that any by-law or regulation was ever adopted by the hospitals pursuant to such an agreement.

The facts with respect to the fifteen or twenty hospitals in Seattle, other than government-owned hospitals, will first be considered, reserving for separate discussion the facts relative to respondent Renton Hospital.

In accordance with the almost universal custom, doctors authorized to practice in the Seattle hospitals are designated as the staff of the hospital. This staff is normally divided into two groups, one consisting of the active staff, and the other consisting of various auxiliary categories having associate, courtesy, visiting, or emergency privileges. A doctor may be on the active staff of one or more hospitals and upon one of the auxiliary staffs of several other hospitals. In such case, he ordinarily takes most of his patients requiring hospitalization to the institutions where he enjoys active privileges. However, he makes use of the other hospitals with which he is associated when the convenience or desire of patients, the nature of the ailment, the percentage of bed-occupancy, or other reasons make this course appropriate. Where a doctor is compelled, for any reason, to send his patient to a hospital with which the doctor has no staff status, it is usually required that the hospital care of such patient be turned over to a staff member.

It has long been the practice of Seattle hospitals to limit staff membership to doctors who are members in good standing of the Society. Thus, for many years it has been the universal custom, with only rare exceptions, to deny staff mem-

bership to doctors who, by reason of their practice of contract medicine, have been unable to secure admission into the Society. This much is established by the undisputed testimony and is, in effect, conceded by respondents. The evidence is in sharp conflict, however, as to the reasons for this restriction and the manner in which it has been effectuated. There is also controversy in the record as to whether appellant physicians' inability to obtain membership on any Seattle hospital staffs (except Group Health Hospital) has been due to such restriction, and the extent, if any, to which they and the Cooperative have been prejudiced by such inability.

The evidence pertaining to the special situation confronting Group Health Hospital convinces us that the doctors on the active staff of that hospital are in real need of courtesy or visiting privileges at other Seattle hospitals. There are other factors, applicable alike to all hospitals, which point to the same conclusion. The active staff members of any hospital should have available to them the surgery facilities of one or more other hospitals, in case some facility failure prevents or curtails use of the surgery usually utilized. Then there are certain classes of patients who require special care that can only be obtained, or can best be obtained, at one particular hospital or another. Taking into consideration the peaks and valleys of hospital occupancy, which do not occur at the same time in all hospitals, the free circulation of patients through the device of courtesy staff privileges also promotes the full utilization of all participating hospitals. This is of advantage alike to hospitals, doctors and patients.

Several members of the staff of Group Health Hospital have applied for such privileges at various Seattle hospitals, but all such applications have uniformly been denied. As a result, these doctors today have no courtsey privileges at any other Seattle hospital, except that Dr. Wm. A. MacColl of the Group Health Hospital staff has been permitted to use the pediatric facilities of Swedish Hospital, although denied staff status. With this minor exception, when it is necessary, for emergency or other reasons, that a patient

of one of such doctors be taken to one of these other hospitals, the Group Health doctor must surrender care of the patient to another doctor on the staff of such hospital. Illustrative of the extent to which this exclusion policy has been applied, is the action of two Seattle hospitals in denying Group Health doctors the right to use its surgery during a four-months period while the Group Health Hospital surgery was undergoing alterations. Because of this refusal it was necessary for Group Health Hospital to utilize some of its limited bed space as a temporary surgery.

Respondents suggest miscellaneous reasons why Group Health doctors have been denied courtesy privileges in other Seattle hospitals. One of these is that the hospitals require applicants for staff privileges to be sponsored by two members of the active staff of the hospital where application is made. Another reason advanced by respondents for the uniform exclusion of Group Health doctors is that it is necessary from an economic standpoint, for such hospitals to confine staff privileges to doctors who do not owe primary allegiance to another hospital. Still another reason advanced why the Seattle hospitals exclude Group Health doctors is that the hospital bed-occupancy rate is so high there is not room for additional staff members.

We have examined the evidence with respect to each of these reasons, and are satisfied that they are for the most part without merit. In our opinion, they are not, in any event, the real reasons why appellant physicians have been excluded from these hospitals. The real reason why Group Health doctors have been denied such hospital privileges is because of the long-standing policy, referred to earlier, of admitting only members of the Society to such hospital staffs. It is therefore necessary to determine why the hospitals came to adopt this uniform policy.

The model by-laws, rules, and regulations for medical staffs, issued by the American college of surgeons, provide that applicants for staff membership shall be "qualified for membership in the local medical society." There is no rule or regulation of the college of surgeons or of the A. M. A.

requiring that such applicants be actual members of the local medical society. Until at least July, 1948, however, doctors associated with both appellants and respondents were under the misapprehension that these national organizations had such a requirement.

It has for many years been the policy of the Society, Service Corporation, and Bureau to disapprove of the appointment of nonmembers of the Society (particularly those who engage in contract practice) to the active or auxilliary staffs of the Seattle hospitals. There have been isolated instances in which, in an effort to effectuate this policy, members of the Society have specifically threatened to withdraw their patronage if nonmembers of the Society were admitted to a particular hospital staff. In general, however, neither these organizations nor their members have sought to promote the policy referred to by means of direct threats of this kind. Nor is there substantial evidence to indicate that these organizations have entered into formal agreements or understandings with the hospitals in order to give effect to this exclusion policy.

In our opinion, the success achieved by the Society, Service Corporation, and Bureau in having the hospitals adopt this exclusion policy has been realized through persuasion and economic pressure. Effectuation of the policy has been aided by the organizational setup of the hospitals, whereby they have in the main left the selection or approval of new staff members to the existing staff, which is, of course, comprised of members of the Society. Members of the Society, personally convinced of the wisdom of the policy, or fearful that disregard of such policy would adversely affect them or their hospitals, have exerted their authority or influence as hospital staff and committee members to obtain hospital adherence thereto.

The complete success achieved by the Society, Service Corporation, and Bureau in this respect is made evident by the advice which the Society unhesitatingly supplied to out-of-state doctors who were considering association with Medi-

cal Security Clinic. Such inquiries were consistently answered as follows:

"The clinic you mention is conducting a group practice under contract plan with no free choice of physician, charging so much per individual.

"Naturally, this type of contract medicine is against the rules and principles of our society. Therefore, none of the men connected with this clinic are members of our society *and by the same token they are not permitted to practice in any of our recognized hospitals.*" (Italics ours.)

The exclusion policy, thus effectuated, has in recent years been directed primarily against the Cooperative, which is Service Corporation's principal competitor in the industrial contract field. The purpose of the Society, Service Corporation, and Bureau has been primarily to benefit the members of the Society and its affiliates through the elimination of such competition. The means employed has, as indicated above, been oppressive in the extreme, rendering it very difficult for the Cooperative and its staff members to carry on their contract practice.

The situation with respect to respondent Renton Hospital calls for separate consideration. The hospital itself was built in the years 1944-1945 as a war emergency facility by the United States government. It was then operated under lease by the Valley Hospital Foundation, Inc., a nonprofit corporation. The staff was composed only of doctors who were members of the Society. After the war, the Federal government desired to liquidate its interest in the hospital. It is unnecessary to review the various efforts which were then made by local citizens, particularly the Renton doctors, in an effort to acquire and operate these facilities as a general hospital. It is sufficient to say that the Society was drawn into the matter and rendered a great deal of advice and assistance. One of the prime motivating factors of both the local doctors and the Society was to prevent these facilities from falling into the hands of any organization engaged in independent contract practice.

Success in this endeavor was attained after the Renton Hospital staff members directed their attention to the crea-

tion of a hospital district under the provisions of the public hospital district act (Laws of 1945, chapter 264, p. 841, as amended by laws of 1947, chapter 225 1 p. 947 (Rem. Supp. 1945 and 1947, § 6090-30 *et seq.*)). The district was organized by vote of the citizens of the district on December 16, 1947. The district, on January 1, 1949, purchased the hospital from the United States government, through the Federal Works Agency, at a price of $200,000, the purchase funds being raised through the sale of bonds.

The hospital was then taken over as a going business, the same medical staff being continued, and the by-laws of the predecessor organization being continued in effect. These by-laws had been drafted in 1945 by a committee comprised of members of the Valley Hospital Foundation staff, and without consultation with other members of the Society. Article II, § 1, of these by-laws provides as follows:

"The applicant for membership on the medical staff shall be a graduate of a recognized medical school, legally licensed to practice medicine in the State of Washington, *a member of the King County Medical Society,* and practicing within a reasonable distance of the hospital." (Italics ours.)

The chairman of the drafting committee testified that, in preparing the by-laws, he followed the standard plan of a hospital as laid down in the manual of the American college of surgeons. He was handed a copy of the manual of hospital standardization of the American college of surgeons and asked to point to the provision referred to. The witness stated, however, that the manual he used was a different document, dealing only with small hospitals. In its brief on appeal, Renton Hospital concedes that the manual of hospital standardization referred to above is controlling.

As previously indicated, this manual does not require that the hospital staff be limited to members of the local medical society. The hospital standardization scoring report, by which the Renton Hospital was measured by the American college of surgeons, shows, in fact, that of a thousand possible points, only three could be allowed on the basis that the staff was restricted to members of, or eligibility for membership in, the local medical society. Two of the Renton

Hospital's commissioners approved of the by-law because they thought that the hospital district law required them to do so.

Three of appellant doctors thereafter applied for Renton Hospital staff membership, so that they might serve actual and potential Renton patients under contract with the Cooperative. One of these applicants resides in Renton. All three applicants were recognized in the minutes of the staff as being qualified, except for lack of Society membership. The staff rejected their applications solely on this ground. Dr. Schultz of the staff testified that he told the hospital commissioners that all the staff members would take their patients out of the hospital "and leave them go broke," if appellant physicians were granted access to it.

Appellant Huseland, who is a member of the Cooperative and a resident and taxpayer within the Renton Hospital district, requested emergency access to the hospital to have his boy attended by appellant Dr. Bunker. This request was refused, as were requests made in behalf of other hospital district residents, even as to the use of X-ray facilities in emergencies. Access was denied unless the patients were willing to have their care surrendered to a Renton Hospital staff member. In such case, all that the physician chosen by the Cooperative member could do would be to write suggestions on progress notes, which the staff member at the Renton Hospital might follow or disregard, as he saw fit.

The importance of access to Renton Hospital, on the part of appellants and others under contract with the Cooperative, is clearly established in the record. From twenty-five hundred to three thousand residents of the Renton area are eligible to receive service from the Cooperative, and an undisclosed number of such residents are now under contract to receive this service. The appellant physician residing in Renton whose application was rejected is obliged to drive back and forth to see his Renton patients while they are hospitalized at Group Health Hospital in Seattle. His Renton patients, in order to retain the physician of their choice, are required to undergo the pain, danger, and expense of being conveyed to that Seattle hospital. Appellant Huseland, for

example, had to convey his boy, stricken with pneumonia, to the Seattle hospital, despite severe winter weather, with ice and snow on the roads.

The commissioners, being in doubt as to their duties and responsibilities under the public hospital district act regarding the selection of the medical staff, requested an opinion of the attorney general. Under date of May 13, 1949, the attorney general rendered an opinion which the hospital district commissioners took to mean that they were required to accede to the views of the medical staff in the selection of new staff members. The restriction against the admission of appellant physicians was therefore continued in effect.

As in the case of the other respondents, Renton Hospital officials have suggested a number of reasons why, in their view, the exclusion of appellant physicians is justified. These reasons are the same as those advanced by the Seattle hospitals. We have examined the record and are of the view that none of these is the real reason why appellant physicians have been excluded from that hospital. As in the case of the Seattle hospitals, the real reason is that, through persuasion and economic pressure exerted by the Society, Service Corporation, and Bureau, Renton Hospital has adopted the policy of excluding all physicians who practice "unauthorized" contract medicine.

*Fourth* overt act charged: That the Society has prevented any physician from joining that organization, regardless of his professional qualifications or character, who performs prepaid medical or surgical service in competition with Service Corporation.

The trial court's memorandum opinion contains no finding relative to this allegation.

It is not disputed, and is in fact conceded, that appellant physicians cannot now obtain admittance to the Society unless they will agree to discontinue the practice of medicine under the Cooperative's industrial contracts. This policy was initiated in 1933, at the time Article III, § 8, of the Society's by-laws was amended for the purpose of subjecting to discipline any member who engages in contract

practice not authorized by the board of trustees. While that by-law applies, ostensibly, to members of the Society, its actual and necessary effect has been to require the denial of the application for membership of any doctor who would be subject to such discipline. The applications of several appellant physicians have been denied on this basis. Other appellant physicians have refrained from applying for Society membership because of the indicated certainty of rejection.

The importance to appellant doctors of membership in the Society is not disputed. The desirability of such an affiliation is stressed in both the new and old Principles of Medical Ethics of the A. M. A. Such membership is necessary in order to obtain hospital privileges, a matter which has already been discussed. It is necessary in order to obtain certification by specialty boards, and in order to obtain consultation services from other doctors, matters which will be separately discussed at a later point in this opinion. Such membership is also necessary in order to affiliate with the state and national medical associations where advantage may be taken of broad programs of scientific and medical advance. Only through such membership may a doctor secure access to numerous technical papers, and obtain the right to attend meetings and conferences of doctors devoted to general and local medical problems. Perhaps more important than all of these other considerations, a nonmember of the Society is quite generally regarded as an outcast by his fellow practitioners, his patients, and members of the public, and suffers very real humiliation and embarrassment.

*Fifth* overt act charged: That the Society has refused to accept transfers of membership from other local medical societies affiliated with the A. M. A., of doctors intending to render service to the Cooperative.

The trial court's memorandum opinion contains no finding relative to this allegation.

Appellant physician John McNeel was denied a transfer of membership to the Society from the Albemarle County

Medical Society in Virginia, on the sole ground that he was in active practice in Seattle with the Cooperative. The Society's response to several out-of-state inquiries concerning contemplated practice with the Cooperative, referred to above, indicates that a request for a transfer by any other physician associated with the Cooperative would have been similarly rejected. This policy respecting transfers is of course a necessary concomitant of the Society's policy regarding admission of local doctors. We find that the allegation quoted above is fully sustained by the evidence.

*Sixth* overt act charged: That the Society, Service Corporation, and Bureau have, by the threat and practice of professional and social ostracism, caused members of the Society to refuse to enter Group Health Hospital for the purpose of consultation.

The trial court's memorandum opinion contains no finding relative to this allegation.

Article III, § 8, of the Society's by-laws, quoted earlier in this opinion, provides in part that any member who performs services for the patients of, or performs services in, any institution or group, shall be liable to disciplinary action unless such services shall previously have been authorized by the board of trustees. This provision, in effect, prohibits any service for patients under contract with the Cooperative rendered in consultation with physicians employed by the Cooperative, or performed at Group Health Hospital. Mention has also been made of the resolution, adopted in 1936 by the Society's board of trustees, but not acted upon by the Society membership, expressing the view that it is "unethical" for any member to consult with any physician who is not a member of the Society and who is doing private contract practice, regarding any contract patient. This resolution was published in the Society's Bulletin and was thereafter approved in a report submitted by the membership committee.

The evidence indicates a broad divergence of views and practice among individual members of the Society regarding conformity to this settled policy. Some members

altogether refuse to enter into any consultation work with physicians associated with the hospital. Others are willing to do so if no written report or other record of the employment is retained which might later come to the attention of the Society's grievance committee. Other members of the Society are willing to render such service where it is requested by the patient (as distinguished from the Group Health physician) and where it is considered that the patient's welfare requires such service. Still others appear willing to render consultation service for Group Health physicians on about the same basis as they would for a member of the Society.

The record indicates that, on the whole, the Society's rule against such consultation is not strictly enforced, and the matter of conformity is left, to a considerable extent, to the judgment of individual members. The general attitude of the Society seems to be that regular consultative or other assistance to Group Health physicians is "unethical"; but that members of the Society should give first consideration to the interests of the patient, and where, in a particular case, the need of such service is indicated, members may, and are expected to, render it.

There is little doubt that the policy of the Society and Service Corporation respecting consultation has seriously handicapped the Cooperative in the rendition of competent medical service. The physicians associated with the Cooperative do not have complete freedom, as do other Seattle physicians, to call upon specialists at random and as needed. In many cases where such service has been obtained from a member of the Society, the consultant has required that the patient be removed from Group Health Hospital to another Seattle hospital to which the attending physician employed by the Cooperative did not have access. In some cases, appellant physicians have been unable to secure the services of specialists on any basis. Thus they have been unable, for this reason, to secure physician-anesthetists, despite the acute need for them in cases of complicated surgery.

It is unquestioned that good professional practice, custom, and need call for as wide a choice of consultants and specialists as the particular case demands. This was conceded by witnesses who are affiliated with respondents. It has become increasingly true in recent years due to the trend towards specialization of personnel and the development of specialized equipment which is often relatively scarce in any one community. Article III, § 1, of the A. M. A. Principles of Medical Ethics, 1949, specifically provides:

"In a case of serious illness, especially in doubtful or difficult conditions, the physician should request consultation."

The record does not support the allegation that the Society's rule against consultation has been enforced by the threat and practice of "social" ostracism. It is no doubt true that some, or perhaps many, individual members of the Society feel so strongly on the subject that they have refused to mingle with the Cooperative physicians socially. There is nothing to indicate, however, that this is an enforcement technique officially sponsored or promoted by the Society, Service Corporation or Bureau.

In all other respects, but with the exceptions noted, we find that the allegation regarding the rule against consultation is sustained by the evidence.

*Seventh* overt act charged: That the Society has caused to be inserted in the telephone directory an advertisement which falsely informs the public that the Society fairly and impartially admits into or excludes from its membership individual physicians upon the basis of the published standards, when in truth the members of the staff of the Cooperative are denied membership in the Society, not on the basis of the published standards, but solely because of their connection with the Cooperative.

The trial court's memorandum opinion contains a finding to the effect that this advertisement appeared long prior to the organization of the Cooperative; that only certain members of the Society, for a fee, subscribe for this service; and that the conclusion which appellants draw as to the

false impression conveyed by the advertisement is not well-founded or justified.

The advertisement in question occupies an eighth of a page in the classified section of the Seattle telephone directory. It has been running since about 1935. The copy for this advertisement is approved by the Society. It is not clear from the record whether this advertisement is paid for by the Society or by the King county medical telephone exchange. This latter agency is not affiliated with the Society, but operates with the approval of the Society for the convenience of the Society members.

We have examined the evidence bearing upon this allegation and agree with the trial court that the conclusion which appellants draw as to the false impression conveyed by this advertisement is not well founded.

*Eighth* overt act charged: That the Service Corporation has caused its regularly-employed solicitors to state falsely to members of the public that the physicians employed on the staff of the Cooperative are unethical, lack professional qualifications, and are ineligible for membership in the Society because they lack the published professional and moral qualifications for membership.

The memorandum opinion of the trial court contains a finding to the effect that there is no evidence that any of respondents made such statements or authorized them to be made.

There have been isolated instances in which agents and representatives of Service Corporation made derogatory statements to members of the public regarding the professional standing and competence of appellant physicians. In our opinion, these statements were not sufficiently defamatory to constitute libel *per se*. Nor does the record indicate that they were part of the course of conduct authorized by the Society in its effort to restrain competition. The last-quoted allegation, therefore, is not sustained by the evidence.

*Ninth* overt act charged: That the Society has endeavored to prevent the Cooperative from employing physicians

needed by it, by making it known to prospective employees that any physician who accepts such employment subjects himself to the sanctions which the Society has brought to bear against all members of the staff of the Cooperative.

The memorandum opinion contains the statement that this charge is not sustained by the evidence.

There is no doubt that the Society's policy of opposition to the Cooperative operated to prevent that organization from obtaining the employment of nonresident doctors. In connection with the recruitment of out-of-state doctors, the Cooperative frankly advised prospective staff members of the situation. The evidence indicates that many of these prospects, upon learning of this, rejected the tender of employment on that ground alone. However, aside from the way in which it responded to several inquiries in 1945 and 1946, there is no indication that the Society has taken affirmative steps to discourage employment by the Cooperative of nonresident doctors.

With respect to doctors residing in King county, the situation is entirely different. Almost all of these doctors are members of the Society. Through the by-laws referred to above, and through the general surveillance maintained over the situation by the officers, boards of trustees, and committees of the Society, Service Corporation, and Bureau, a constant and strenuous effort has been made to discourage members of the Society from accepting employment with the Cooperative. This was but another manifestation of the same policy which led the Society to discourage its members from consulting with physicians associated with the Cooperative. The success achieved in this direction is the principal reason why the Cooperative found it necessary to look elsewhere for its new staff members.

We find that this allegation is sustained by the evidence.

*Tenth* overt act charged: That the Society has prevented doctors regularly employed on the staff of the Cooperative from being certified as specialists, by denying to them the prerequisite of membership in the Society.

The trial court's memorandum opinion contains the statement that this charge is not sustained by the evidence.

It is of great professional advantage to a physician or surgeon who desires to specialize in some field of medicine, to obtain certification from one of the specialty boards which function in conjunction with the A. M. A. Included in these specialized fields are such branches of medicine as surgery, orthopedic surgery, ear, nose and throat, internal medicine, pediatrics, opthalmology, and dermatology. Several of the staff members associated with the Cooperative have been desirous of obtaining certification on one or another of these boards. They are prevented from doing so, however, since most of those specialty boards require, as one prerequisite to certification, membership in the local medical society. For the same reason, several of these physicians have been denied membership in local or national specialty organizations.

It is to be noted that the disadvantage complained of under this allegation results from no separate and independent overt act on the part of any of the respondents. It is simply a consequence of the Society's membership exclusion policy.

In spite of the various overt acts discussed above, committed over a period of nearly four years, the Cooperative has managed to survive. It has, in fact, registered a subtantial growth during that period, both as to membership and facilities. The commission of these overt acts has nevertheless tended to undermine the Cooperative's prestige and reputation. They have caused the Cooperative to incur expenses which could otherwise have been avoided. They have forced the organization to divert its attention to matters extraneous to the usual and ordinary problems of professional medicine. It therefore seems evident that, had it not been for these obstacles thus presented, the Cooperative would have been better able to serve its patients and would have extended its service and facilities substantially beyond the point actually realized.

Appellants concede that these are losses which, in the main, are not susceptible of computation with the degree of definiteness necessary for the recovery of money dam-

ages. However, they allege that monetary loss to the extent of $4,500, sustained by the Cooperative, is provable, and ask for recovery of damages in that sum. In support of this claim there were submitted an exhibit and testimony tending to establish that the Cooperative incurred expenses in the sum of $5,521.43, in recruiting professional staff members from outside the state. The appellants' theory is that, had it not been for respondents' policies and conduct, needed staff members could have been obtained in King county.

Over $3,300 of this alleged expense consists of travel allowances and salary paid to members of the staff of the Cooperative while they were in the east. The testimony indicates that these staff members, while in the east, devoted some time attempting to recruit personnel. In each case, however, the primary purpose of the trip was apparently to attend professional conferences and conventions, or to engage in postgraduate work. No attempt was made to segregate the time or expense attributable to the recruiting activity from that made necessary by these other interests.

The remaining items of expense represent travel expenses and salary paid to several eastern doctors. In some cases, travel expenses were paid so that these doctors would come out here and look over the situation. In other cases, travel expenses and salary were paid to eastern doctors who were employed by the Cooperative and apparently placed on the payroll while they were still in the east. There was no testimony to the effect that these individual doctors declined to come out, or declined to accept employment with the Cooperative, unless these advance payments were made.

We therefore find that this claimed item of damage was not proved with the required degree of certainty and definiteness. We further find, however, that the general loss and damage sustained by the Cooperative, while not compensable in money damages, is serious and irreparable and will be so as long as these overt acts continue.

The five appellant physicians seek recovery of damages in the sum of $15,000 each, by reason of injury to professional reputation and standing in the community and the

sustaining of mental distress and humiliation. Each of these appellants was employed on a salary basis. Hence, none of them was able to demonstrate a monetary loss such as might have been possible had their respective incomes been dependent upon fees from individual patients. These appellants have undoubtedly suffered a certain amount of annoyance, embarrassment and humiliation. There is no basis in the record, however, for calculating the extent of such damage. As in the case of the Cooperative, however, the general loss and damage sustained by appellant physicians, by reason of the overt acts committed by the Society, Service Corporation, and Bureau, is serious and irreparable, and will be so as long as these overt acts continue.

The facts found by this court, as set out above, differ from the views of the trial court in a number of important respects. They also cover several points not touched upon in the trial court's memorandum opinion. These differing and additional findings are, in the main, adverse to respondents. This alone, however, is not sufficient to justify reversal. Appellants are not entitled to prevail unless all the facts, as here found, give rise to a cause of action in their behalf. This is our next inquiry.

We will first consider, as one problem, whether appellants have established a cause of action against the Society and its named officers, the Bureau and its members, and the Service Corporation. They will be referred to in this section of the opinion as if they were the only respondents. We will then consider whether appellants have established a cause of action against Swedish Hospital, or against the Renton Hospital and its named commissioners.

The arguments as to whether a cause of action has been established against respondents have taken a wide range. Appellants advance several theories in support of their position. The one first presented and primarily relied upon is that respondents have been engaged in an unlawful combination or conspiracy in restraint of competition and for the purpose of establishing a monopoly.

Article XII, § 22, of our state constitution reads as follows:

"Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees, or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever, for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section by adequate penalties, and in case of incorporated companies, if necessary for that purpose, may declare a forfeiture of their franchise."

■ The quoted constitutional provision expresses the public policy of this state on the subject of monopolies and restraints on competition. This was made clear in *American Export Door Corp. v. John A. Gauger Co.*, 154 Wash. 514, 519, 283 Pac. 462, where it was said:

"Without going into history, it is sufficient to say that our constitutional provision above quoted is simply a recognition of the common law on the subject reduced to definite terms and made the fundamental law of the state. It was adopted before the enactment of the Sherman Anti-Trust law by the Congress of the nation, and it stands as the complete and wholly unobscured guide pointing out the plain pathway of public policy in this state."

The legislature has implemented the constitutional provision with statutes providing a criminal penalty (Rem. Rev. Stat., § 2382(5) (6) [P.P.C. § 113-99]), and providing for the forfeiture of corporate franchises (Rem. Rev. Stat., § 2384 [P.P.C. § 113-103]). Neither of these statutes is applicable here, however, since this is a civil action for damages and injunctive relief.

It will be observed that three elements must be present in order to constitute any relationship a monopoly or trust within the meaning of Article XII, § 22. There must be a contract, combination, or other arrangement between two or more corporations, copartnerships or associations; it must relate to some product or commodity; and its purpose must be to fix prices, limit production, or regulate the transportation of such product or commodity.

■ Considering the first of these elements, it is to be noted that the contract, combination, or other arrangement referred to need not be in the form of a written agreement or undertaking. It may be brought into being "in any manner whatever." There is no written contract or agreement between the respondent associations and corporations in this case. In our opinion, however, there is a combination or other arrangement between these respondents within the contemplation of Article XII, § 22.

This combination or arrangement first came into existence when the Society, in April, 1933, caused the Service Corporation and the Bureau to be organized. By prearrangement with the Society, of which they were members, the organizers of the Service Corporation and Bureau made membership in the Society a prerequisite to membership in the Bureau. In the same manner, they arranged that only members of the Bureau could render service under contracts negotiated and administered by Service Corporation.

Having established this complete and exclusive identity of interest, it was an easy matter for these organizations to formulate and carry out their mutual policies in concert. Through the device of Article III, § 8, of the Society's by-laws, relating to eligibility for membership, that organization's policy of curbing contract medicine thus became binding upon the Bureau and Service Corporation. By means of the same by-law, and due to the close ties maintained through overlapping membership, all three organizations were assured that no contract medicine plan which would compete with Service Corporation would be approved.

In furtherance of their mutual interests, these organizations and their members worked together in the exchange of information, the investigation of contract practices, and the enforcement of their mutual policies. They also took effective steps to prevent or discourage members of the Society from consulting or associating with appellant doctors in any professional way. The combination or arrangement, in an effort to render Society membership indispensable and submission to its contract medicine policies therefore

obligatory, then exercised its influence and economic power to obtain exclusion of appellant doctors from hospital staffs. There were also other steps taken in pursuance of this course of conduct, as noted earlier in this opinion.

Having found the existence of a combination or other arrangement of the kind referred to in Article XII, § 22, we come to this question: Does this combination or arrangement relate to a "product" or "commodity" within the meaning of the constitutional provision?

The word "commodity," as used in such statutes and constitutional provisions, is usually taken to mean an article of movable or personal property. See the authorities cited in 58 C. J. S. 1010, Monopolies, § 39. This accords with the definition of the term to be found in Webster's New International Dictionary (2d ed.) Unabridged.

One court has held that the terms "product" and "commodity" are synonymous. *Nasman v. Bank of New York,* 49 N. Y. S. (2d) 181. We cannot readily accept that view with reference to this constitutional provision, since it would mean that one or the other of these terms is superfluous. A statute or constitutional provision should, if possible, be so construed that no clause, sentence or word shall be superfluous, void, or insignificant. *Martin v. Department of Social Security,* 12 Wn. (2d) 329, 121 P. (2d) 394; *Groves v. Meyers,* 35 Wn. (2d) 403, 213 P. (2d) 483.

The term "product" is often used to denote tangible articles perceivable by the senses. However, the definitions of the term, as supplied by authoritative lexicographers, indicate that it may be used in a broader sense. Thus, Webster's New International Dictionary (2d ed.) Unabridged, defines the term as:

"Anything produced, as by generation, growth, labor, or thought, or by the operation of involuntary causes; as, the *products* of the season, or of the farm; the *products* of the brain, . . ."

It will be seen that services of every kind and description, including prepaid medical and hospital services, are comprehended under this definition, since they are produced by the application of labor and thought. Whether, in the

case before us, the term "product" should be given this broad meaning, depends upon the context in which it is used and the underlying objective of the constitutional provision in question.

The essential purpose intended to be served by Article XII, § 22, is the prohibition of such restraints of trade or competition as may operate to bring about monopolies. *Sears v. Western Thrift Stores*, 10 Wn. (2d) 372, 383, 116 P. (2d) 756. As indicated in *American Export Door Corp. v. Gauger Co.*, *supra*, this is simply a recognition of the common law.

At the common law, the term "restraint of trade" was deemed to cover the practice of medicine. *Mandeville v. Harman*, 42 N. J. Eq. 185, 7 Atl. 37; *United States v. American Medical Ass'n*, 110 F. (2d) 703, 711; *American Medical Ass'n v. United States*, 130 F. (2d) 233, 237. The corporate activity of offering, entering into, and performing contracts providing for prepaid medical service, is also a business or trade at common law. *American Medical Ass'n v. United States*, 317 U. S. 519, 528, 87 L. Ed. 434, 63 S. Ct. 326.

As our constitutional provision bespeaks the common law, so it should be permitted to afford the same protection and serve the same broad public interest which is available at common law. Monopolies affecting price or production in essential service trades and professions can be as harmful to the public interest as monopolies in the sale or production of tangible goods. The constitutional provision was designed to safeguard this public interest from whatever direction it may be assailed. The language used must therefore be liberally construed with that end in view.

It is our conclusion that medical and related services rendered in connection with prepaid contracts of the kind here in question, are "products" within the meaning of Article XII, § 22.

The question next presented is whether the combination or other arrangement relative to these medical and related

services has for its purpose the fixing of prices, or the limiting of production of such products.

 All members of the Bureau bound themselves to render service under the contracts sold and administered by Service Corporation. The terms of such contracts, including the services available thereunder and the prescribed monthly payments, were dictated by Service Corporation, acting for the combination. All members of the Bureau and Society bound themselves to render no other contract service. They then pursued a course of conduct designed to prevent others from rendering any competing contract service. Thus the purpose of the combination was to limit production and, incidentally, to fix prices to be charged for contract medicine service.

 There is a well-settled rule, however, that Article XII, § 22, does not condemn price fixing and the limitation of production *per se,* but only when either of these results is brought about in connection with a monopoly, with resulting unreasonable restraint upon competition. *Sears v. Western Thrift Stores, supra*; *Washington Cranberry Growers' Ass'n v. Moore,* 117 Wash. 430, 201 Pac. 773, 204 Pac. 811, 25 A. L. R. 1077. It is therefore necessary to determine whether respondents' combination or arrangement by which production is limited and prices are fixed with respect to prepaid medical service, amounts to a "monopoly" in the constitutional sense.

 The test to be applied in making this determination was well expressed in *Fisher Flouring Mills Co. v. Swanson,* 76 Wash. 649, 658, 137 Pac. 144, where the court said:

"Contracts fixing prices as incidental to some main contract, and involving less than a controlling part of a given commodity in a given market, not proceeding from, nor tending to create, or to maintain a monopoly, will be sustained when the restriction is, under the circumstances of the particular case, reasonable in reference to the interests of the parties, and reasonable in reference to the interests of the public; that is to say, when the price fixed is fairly necessary to the protection of the covenantee, and fair to the public in that it furnishes only a reasonable profit to the contracting

parties. Lacking these elements, such contracts are invalid as contrary to public policy."

Applying this test, it has been held that, where the contract or combination controls a relatively small proportion of the product being produced or sold in any market, price fixing is not an unreasonable restraint upon competition and hence is not monopolistic and void under Article XII, § 22. *Fisher Flouring Mills v. Swanson, supra; Washington Cranberry Growers Ass'n v. Moore, supra.*

It has likewise been held that marketing contracts entered into pursuant to Rem. Rev. Stat., § 2892 [P.P.C. § 253-35], whereby producers are obliged to sell all products to a co-operative marketing association for resale at prices fixed by such association, are not void under Article XII, § 22. *Pierce County Dairymen's Ass'n v. Templin,* 124 Wash. 567, 215 Pac. 352; *Olympia Milk Producers' Ass'n v. Herman,* 176 Wash. 338, 29 P. (2d) 676. Agreements of this kind may involve a relatively large proportion of the product being produced, but pertain only to prices and marketing and do not operate to limit or control production.

On the other hand, where the element of controlled or limited production is present, the contract or combination is declared to be monopolistic and hence void under the constitution. *American Export Door Corp. v. Gauger Co., supra.*

There can be no question but that the purpose of the combination in the instant case is to pre-empt and control all contract medicine practice in King county. If respondents are successful in this effort, there will be no competition in the contract medicine field. Members of the public will have no opportunity to choose between two or more plans offering this type of service. The result will be a complete monopoly of this product throughout the county.

It is true that as yet respondents have not been completely successful in establishing a monopoly. At the time of the trial the Cooperative and the very small Bridge Clinic were affording competition in the contract medicine field. However, the monopolistic character of a combination is

not to be tested by what has been done under it, but what may be done under it; "not by its performance, but by its powers of performance when fully executed." *Pocahontas Coke Co. v. Powhatan Coal & Coke Co.,* 60 W. Va. 508, 56 S. E. 264. See, also, *Associated Press v. United States,* 326 U. S. 1, 12, 89 L. Ed. 2013, 65 S. Ct. 1416.

Here the combination may be utilized not only to stifle all competition with Service Corporation, but also may very well be employed to eliminate all contract practice in the county, including that now rendered by Service Corporation. All that would be necessary to accomplish this, after all competition was destroyed, would be for Service Corporation to exercise its reserved right to terminate its own contracts, and for the Society's board of directors to withdraw approval of the Service Corporation contracts and withhold approval of any others.

Nor is this possibility altogether remote. The record indicates that when the Society first decided to offer prepaid contracts, it was thought of as a temporary expedient. Respondent Society even now has the view, as expressed in its brief, that as the state, and particularly as King county, became much more highly industrialized, "the necessity for this form of medical care tended to vanish with the conditions which created it."

In *American Export Door Corp. v. Gauger Co., supra,* it was held that a combination of door manufacturers which came into possession of similar powers to limit or eliminate production amounted to a monopoly. It was there said:

"Having invited its members to abolish their selling organizations and having set up its own to take their place, respondent would have the power to reduce the production of its members for export to nothing, if it saw fit, and that power is one of the evils which our constitution is intended to prevent." (p. 520.)

Respondents contend that there can be no monopoly because all qualified physicians are entitled to join the Society and participate in Service Corporation's medical plan. *Anderson v. United States,* 171 U. S. 604, 43 L. Ed. 300, 19

S. Ct. 50, and the *United States v. Associated Press,* 52 F. Supp. 362, are cited in support of this view.

In the *Anderson* case, it was held that the Traders' Live Stock Exchange, in Kansas City, Missouri, was not an unlawful combination in restraint of trade. Any yard trader could become a member of that association upon complying with its conditions of membership, and could remain such as long as he comported himself in accordance with its by-laws. The by-laws prohibited members from transacting business with other yard traders who are not members. The court held that the agreement lacked every ingredient of a monopoly, and pointed out that "everyone can become a member of the association."

The facts in the *Anderson* case differ from those here established in several important respects. The by-laws of the Traders' Live Stock Exchange did not require that applicants for membership give up any of their business, and that association itself was not engaged in any business. In the instant case, applicants for membership in the Society are required to discontinue their industrial contract practice, and Service Corporation, a member of the combination, is itself engaged in providing that kind of service. Thus the public would be deprived of all competition in the contract medicine field, and could, as pointed out above, be completely denied such service.

That the court in the *Anderson* case would have reached a different result under the facts of this case, is indicated by the following quotation from that opinion:

"The agreement lacks, too, every ingredient of a monopoly. Everyone can become a member of the association, and the natural desire of each member to do as much business as he could would not be in the least diminished by reason of membership, while the business done would still be the individual and private business of each member, and each would be in direct and immediate competition with each and all of the other members. If all engaged in the business were to become members of the association, yet, as the association itself does no business, it can and does monopolize none. . . . " (p. 619.)

In *United States v. Associated Press, supra* (affirmed in *Associated Press v. United States,* 326 U. S. 1), the court struck down an oppressive by-law which effectually denied membership to any applicant which was at that time in competition with an existing member of the Associated Press. The court enjoined enforcement of this by-law · on the ground that it was an unreasonable restraint of competition. The Associated Press argued against the granting of such relief on several grounds, one being that the question of freedom of the press was involved. It was in this connection that Judge Learned Hand used the following words, upon which respondents here rely:

"The argument appears to be that if all be allowed to join AP, it may become the only news service, and get a monopoly by driving out all others. That is perhaps a possibility, though it seems to us an exceedingly remote one; but even if it became an actuality, no public injury could result. For, if AP were open to all who wished the service, could pay for it, and were fit to use it, it would be no longer a monopoly: a monopoly of all those interested in an activity is no monopoly at all, for no one is excluded and the essence of monopoly is exclusion. AP would then be only a collective effort of the calling as a whole. If other services were incidentally driven out, that would not be an actionable wrong." (p. 374.)

It must be readily apparent that this language, when taken in conjunction with the result reached in that case, is authority exactly contrary to respondents' position. The court there struck down a by-law which denied membership to any newspaper which competed with present members. The court then declared that, with this by-law eliminated, and newspapers left free to join the association *and still continue their competition,* no monopoly would exist. So here, if the by-law provision which requires applicants for membership in the Society to give up their contract practice in competition with Service Corporation were eliminated, the Society and its affiliates would no longer monopolize or threaten to monopolize contract medicine.

Respondents also resist being characterized as a monopoly on the ground that the prime purpose of the Society

and its affiliates is to uphold the quality of professional service being rendered in King county, and to maintain proper ethical standards in the profession. In support of this position, respondents cite authorities to the effect that, where business concerns associate for the purpose of mitigating recognized evils and to foster fair competitive opportunities, this will not be regarded as an undue restraint of trade and competition, or as amounting to a monopoly. See *Appalachian Coals v. United States,* 288 U. S. 344, 374, 77 L. Ed. 825, 53 S. Ct. 471, and *Sugar Institute v. United States,* 297 U. S. 553, 598, 80 L. Ed. 859, 56 S. Ct. 629.

In the *Appalachian* case, the court made it clear that the co-operative enterprise there in question carried with it "no monopolistic menace." In the *Sugar Institute* case, the judgment was one holding that there *was,* not that there was not, a combination in restraint of trade.

The great public service which medical associations render in developing and maintaining high standards of professional conduct and practice is a matter of general knowledge. The record amply demonstrates that, in numerous respects, and over a great many years, the Society has rendered valuable service in this direction. We do not intend to imply by anything said in this opinion that the Society may not adopt reasonable and effective methods of preserving the high quality of service and the high ethical standards of the profession. Yet we must say, as did the court in *United States v. American Medical Ass'n,* 110 F. (2d) 703, 712, in dealing with a similar contention:

"Notwithstanding these important considerations, it cannot be admitted that the medical profession may through its great medical societies, either by rule or disciplinary proceedings, legally effectuate restraints as far reaching as those now charged. . . ." (p. 712)

The facts do not bear out the contention that respondents' course of conduct is necessary because of the quality of professional service rendered by appellants, or because appellants are practicing medicine in an unethical manner. We have found that the quality of professional service rendered by appellants is not substantially below the quality

of service rendered by the average physician, surgeon, clinic, or hospital in the community. We have also found that appellants' manner of practice is not "unethical" in the sense used by the A. M. A., or as the term is generally understood by laymen. It may also be noted that the contract practice of medicine, as carried on by appellants, does not constitute "unprofessional conduct," as that term is defined in Rem. Rev. Stat., § 10015 [P.P.C. § 734-25].

The Society, in characterizing appellants' contract practice as "unethical," is making an unusual and arbitrary application of that opprobrious term. It is not using the term as a label for conduct which is violative of some established moral principle applicable to the medical profession. Rather, it here uses the term to castigate those who seek only to carry on contract practice independent of and in competition with Service Corporation. In our opinion, the Society may not, through the mere use of the term "unethical," clothe with immunity acts which would otherwise fall under the ban of the antimonopoly provision of our constitution.

It is our conclusion, on this branch of the case, that the limitations on production and the price fixing shown to exist here are being consummated in connection with a monopoly as that term is used in Article XII, § 22, of the state constitution.

It therefore appears that, in the relationship established and course of conduct pursued by respondents, there are present all three elements essential to the establishment of a monopoly or trust, within the meaning of the constitution. There is a combination or other arrangement between two or more corporations and associations; it is concerned with the production and sale of a product—prepaid medical and hospital service; and the purpose of the combination is to limit the production and fix the prices of that service with the object in view of restraining competition and creating a monopoly. Respondents are therefore acting in violation of the antimonopoly provision of the constitution.

The conclusion just reached finds support in the English case of *Pratt v. British Medical Association* (1919), 1 K. B.

244, 9 B. R. C. 982. That suit was instituted by Dr. Pratt and two other doctors to recover damages for conspiracy, slander, and libel, and for an injunction. These doctors had accepted positions on the staff of the Coventry Provident Dispensary, in Coventry, England. The Dispensary was an organization numbering about twenty thousand people in 1906, engaged in prepaid contract medicine. Each member paid an annual subscription fee for the service. The income was then expended for services, drugs, and related items, the balance being divided among the staff members. Members of the staff were also free to engage in private practice.

The British Medical Association was organized in a manner similar to the American Medical Association. It had a national organization with local component or constituent groups. Members of the local organization, designated as the Coventry Division of the Medical Society, had formerly served on the staff of the Dispensary. However, they had later resigned from the staff as an outgrowth of a controversy with the management. Following this action, the local organization adopted a resolution to the effect that no member of the division should associate himself with the Coventry Dispensary.

The plaintiff doctors joined the Dispensary in defiance of this resolution. The local organization, making use of rules of procedure set forth in its by-laws, recommended to the council of the British Medical Association that plaintiff doctors be expelled on the ground that they had broken the rules and regulations of the local organization and that their conduct was therefore detrimental to the "honour and interests of the medical profession." This recommendation was followed and these doctors were expelled from the British Medical Association.

The local organization, then making use of other by-laws, notified neighboring local organizations of the expulsion action. There was also automatically called into play a by-law which had been uniformly adopted by all local organizations, whereby members of the Association were forbidden, except in circumstances of great urgency, to meet in consultation with, or hold any professional relations with,

a medical practitioner who had broken the rules of a local organization or had been declared guilty of conduct detrimental to the "honour and interests of the profession." The result of this course of action was that the plaintiff doctors were, throughout the whole period of the boycott, unable, with one exception, to secure the services in consultation of a single medical practitioner. Their private practice was, in consequence, greatly injured, and they and the members of their families were treated as social and professional outcasts.

The court held for the plaintiffs and awarded substantial monetary damages. The claim of defendants that they were engaged only in upholding the ethics of the profession was carefully examined and expressly rejected. The court said, on this phase of the case:

"The alleged sin was financial rather than moral in its character. This was frankly admitted by several of the defendants' witnesses. The pecuniary interests of the Coventry doctors lay at the root of the matter. The question of ethics as that word is ordinarily understood, had nothing to do with the case. The plaintiffs were punished because they defeated the intended overthrow of the Coventry Dispensary. If the Coventry Dispensary had been destroyed as a lay organization, then the local doctors could obviously have taken such steps as would have increased their area of private practice, and their emoluments would have gained a corresponding expansion. This was the fundamental object of the defendants. The non-participation in such aim by the plaintiffs was the head and front of their offending." (p. 272.)

The court stated, as the basis for granting relief, that a single person, or a body of persons, will commit an actionable wrong if he or they inflict actual pecuniary damage upon another by the intentional employment of unlawful means to injure that person's business. Having found that defendants intended to injure plaintiffs in the carrying on of their profession, the court held that the means employed to effectuate that intention were unlawful in two particulars: They consisted of threats, coercion, and intimidation; and they gave effect to by-law provisions which were in re-

straint of trade and hence void on grounds of public policy. With respect to this latter conclusion, the court said:

"Upon considering the rules in question I have arrived at the conclusion that they are in restraint of trade, and are void on the ground of public policy. They gravely, and in my view unnecessarily, interfere with the freedom of medical men in the pursuit of their calling, and they are, I think, injurious to the interests of the community at large. It may well be that the opinion I have just expressed will, if upheld, destroy the cogency of the defendants' scheme of boycott; but it leaves them with the safer and more kindly weapons of legitimate persuasion and reasoned argument." (p. 274-5.)

The pertinency of this decision with reference to the instant case is at once apparent. The facts are strikingly similar. The medical association sought, as do respondents here, to justify their action on the ground that they were enforcing ethical standards. The court found no merit in this contention. Judgment for the plaintiffs was grounded upon a finding of intentional interference with plaintiffs' calling effected by unlawful means, one of which was the utilization of by-laws held to be invalid because in restraint of trade. The by-laws in question were very similar to those here in question, in that they required members to refrain from consultation or other professional association with doctors who had not conformed to the rules of the local organization. The rules which had been flouted were designed, as are the Society's by-laws in this case, to make it impossible for doctors to engage in any contract medicine not approved by the organization. The fact that the medical association was seeking to advance its own economic interests was held not to defeat the action, where the means employed were unlawful.

Respondents, however, argue that the *Pratt* case is no longer authority in England, except for the limited proposition that malicious interference with one's means of livelihood, without justification, is actionable. In support of this view, respondents cite four subsequent English decisions.

*Ware and DeFreville v. Motor Trade Ass'n* (1921), 3 K. B. 40, and *Sorrell v. Smith* (1925), A. C. 700, two of the deci-

sions relied upon by respondents, criticize some of the language of the opinion in *Pratt v. British Medical Society*. The theory on which these cases were tried was that there had been a combination of persons wilfully to injure the defendants in their trade, with resulting damage. The court held, in each case, that the real purpose of the combination was not to injure another, but to forward their own trade interests, and that the acts were therefore not actionable. In neither of these cases was the specific question of combinations in general restraint of competition raised or discussed. Moreover, the criticized language of the *Pratt* case did not relate to that question, but dealt with other matters. In our view, the *Ware* and *Sorrell* cases do not overrule or disapprove the basic doctrine of the *Pratt* case. The *Ware* case has been similarly appraised in *United States v. American Medical Ass'n*, 110 F. (2d) 703, 711.

The cause of action in *Crofter Hand Woven Harris Tweed Co., Ltd. v. Veitch* (1942), A. C. 435, also cited by respondents, was grounded upon the same theory as in the two cases just discussed. Like them, it did not deal with an asserted combination in restraint of competition. That concept was not mentioned in the opinion, nor was the *Pratt* case discussed or even cited.

The fourth English case cited by respondents is *Thompson v. New South Wales Branch of the British Medical Ass'n* (1924), A. C. 764. Dr. Thompson had been expelled for publishing false charges regarding the professional conduct of a fellow member of the medical association. He brought an action for damages and an injunction, based upon charges of libel, slander, and malicious conspiracy. In support of this last charge, it was argued (citing the *Pratt* case) that the by-laws pursuant to which Dr. Thompson was expelled and denied consultation privileges were in restraint of trade and therefore void. In sustaining a judgment for the defendants, the House of Lords held that the parties to a contract in restraint of trade are at liberty to act on it in the manner agreed, and since Dr. Thompson had been a member of the association he was bound by its laws and could not complain.

It will be observed that the court was here using the term "in restraint of trade" to signify a voluntary agreement whereby the parties contract to limit their own business or professional activities in some respect. The by-laws complained of were not, as in the case before us, directed toward the restriction of the activities of third persons. This basic distinction between a voluntary agreement to limit one's own trade or calling, and a contract or combination to restrain the competition of third persons, was clearly pointed out in *Fisher Flouring Mills Co. v. Swanson,* 76 Wash. 649, 137 Pac. 144. The *Pratt* case was not mentioned in the *Thompson* opinion.

It is our conclusion that the decision in the *Pratt* case on the basic question of combinations in restraint of trade has not been undermined by the subsequent English cases cited by respondents. The decision stands as an authoritative precedent on the subject under consideration. It strongly supports the views heretofore expressed regarding the character of respondents' combination in the case before us.

Still stronger support for this view is provided by the decisions in the so-called Group Health cases which arose in the District of Columbia.

In 1939, the attorney general of the United States filed an indictment against the American Medical Association, the Medical Society of the District of Columbia, and others, charging a conspiracy to restrain trade in the District of Columbia in violation of § 3 of the Sherman antitrust act, 15 U. S. C. A. § 3. The Federal district court entered judgment for the defendants upon sustaining a demurrer to the indictment. The demurrer was sustained on the ground that the medical profession and the hospitals of the District of Columbia are not engaged in a "trade" within the meaning of the act, and that the indictment was vague and uncertain in its allegations. *United States v. American Medical Ass'n,* 28 F. Supp. 753. This judgment was reversed in *United States v. American Medical Ass'n,* 110 F. (2d) 703.

The cause then came on for trial before a jury which convicted the two medical associations. Judgments were entered accordingly, and the two associations appealed. The

judgments were upheld by the United States court of appeals. *American Medical Ass'n v. United States,* 130 F. (2d) 233. This decision was thereafter affirmed by the United States supreme court in an opinion rendered on January 18, 1943. *American Medical Ass'n v. United States,* 317 U. S. 519.

Bearing in mind the particular question of law now under consideration, the significance to be attached to these decisions lies in the ruling, there laid down, that the indictment charged and the evidence proved that the defendants were engaged in restraint of trade within the meaning of the Sherman act. What gives this ruling significance is the well-settled principle that the Sherman act represents a codification of pre-existing common law relating to restraint of trade. *Standard Oil Co. of New Jersey v. United States,* 221 U. S. 1, 55 L. Ed. 619, 31 S. Ct. 502; *United States v. American Tobacco Co.,* 221 U. S. 106, 55 L. Ed. 663, 31 S. Ct. 632. This being so, the views expressed in these opinions on this question are authoritative with respect to our constitutional provision, which is based on the same common-law principle.

The factual similarity between these Group Health cases and the instant case is even more striking than with regard to *Pratt v. British Medical Ass'n.* This is demonstrated by the following concise summary of the indictment, as set forth in *American Medical Ass'n v. United States,* 317 U. S. 519, 526:

"For the moment it is enough to say that the indictment charged a conspiracy to hinder and obstruct the operations of Group Health Association, Inc., a nonprofit corporation organized by Government employees to provide medical care and hospitalization on a risk-sharing prepayment basis. Group Health employed physicians on a full time salary basis and sought hospital facilities for the treatment of members and their families. This plan was contrary to the code of ethics of the petitioners. The indictment charges that, to prevent Group Health from carrying out its objects, the defendants conspired to coerce practicing physicians, members of the petitioners, from accepting employment under Group Health, to restrain practicing physicians, members of

the petitioners, from consulting with Group Health's doctors who might.desire to consult with them, and to restrain hospitals in and about the City of Washington from affording facilities for the care of patients of Group Health physicians."

When this litigation was first before the United States court of appeals, the contention that the indictment did not charge unreasonable restraints was examined at great length. After summarizing the allegations of the indictment and considering the applicable cases, the court concluded that the indictment was entirely sufficient in this respect. The court said:

"Sufficient facts are stated to demonstrate that, unchecked, this exertion of power will necessarily accomplish the abandonment of the co-operative plan of medical service, as well as destroy the livelihood of dissident doctors, because the general restraint thus applied would make impossible the continued operation of the one or the successful practice of medicine by the others. . . .

"Enough has been said to show that the restraint here charged would restrict the common liberty of Group Health, the doctors, and the hospitals from engaging in the pursuit of their respective functions. If on the trial the charge of confederation to this end is sustained, defendants' method of reaching their objective may be thereby defeated, but if the objective is wise—as they insist—they still have left, as was said by the English judge in the Pratt case, the safer and more kindly weapons of legitimate persuasion and reasoned argument. In the proper use of these, much, as we think, may be accomplished to avoid the growing movement toward professional regimentation. Or, this opportunity neglected, members of the medical associations in the District of Columbia perhaps may find in Sec. 3, as we construe it, their only protection in the right to practice on a fee for service basis." *United States v. American Medical Ass'n,* 110 F. (2d) 703, 711, 712.

This view was most forcefully reasserted by the court when the case came before the United States circuit court of appeals a second time. See 130 F. (2d) 233, 244-248. The question of whether the indictment charged or the evidence proved a restraint of trade was one of the three points concerning which certiorari was granted. 317 U. S. 519,

527. As previously indicated, the supreme court affirmed the judgments.

Respondents seek to distinguish the Group Health cases with regard to the restraint of trade question by asserting that the indictment charged the defendants with violating the Sherman act by conspiring *to fix the price of medical care*. In this connection, respondents point out that under the decisions construing the Sherman act, any agreement to fix prices is *per se* an unreasonable restraint of trade. From this it is argued that, except for the charge of price fixing, there would have been no finding that the defendants were in restraint of trade. It is then asserted that there is no evidence of an intention to fix prices in the instant case.

The distinction contended for is without merit. The indictments in the Group Health cases were not predicated upon price fixing. There is no reference in those decisions to price fixing. There were comments to the effect that the defendants sought to restrain an association of persons of modest means from receiving medical service at lower cost, and to coerce doctors and hospitals to this end. But this was incidental to the broad charge of conspiracy to restrain competition through destruction of the business of Group Health. The indictments charged business obstruction and the suppression of competition, the allegations being on all fours with the pleadings and proof in the case at bar.

It is also proper to note that respondents are incorrect in asserting that the element of price fixing is wholly absent in the case before us. Service Corporation (unlike the defendants in the Group Health cases) operates a prepaid medical plan in competition with the Cooperative. Service Corporation fixes the prices to be paid by patients and the fees to be received by doctors under that plan. If successful in its effort to eliminate all competition, Service Corporation will fix the prices and fees for all contract practice in King county. Or, if respondents then choose to discontinue contract medicine, the private fees fixed by individual doctors will supplant the contract rates now available. This latter eventuality is precisely what the United States court

of appeals had in mind in calling attention to the defendants' resistance to low-cost prepaid medicine.

Having concluded that the Society and its affiliates are acting in contravention of the antimonopoly provision of the constitution, we must now consider respondents' view that this, in any event, provides no basis for affirmative injunctive relief. Respondents correctly assert that there is no statute in this state providing for affirmative relief under such circumstances. It remains to be determined whether, as respondents also contend, the common law affords no relief in law or equity against contracts and combinations in restraint of trade and competition other than the refusal to enforce such undertakings.

They cite a great many authorities in support of this proposition. It would be impracticable to discuss all of them individually in this opinion. Most of the cited authorities do announce the rule contended for. In many cases the statement of the rule is *dictum*, since the court had already determined that the contract or combination complained of was not in restraint of trade. Among the cases falling in this category are *Apex Hosiery Co. v. Leader*, 310 U. S. 469, 84 L. Ed. 1311, 60 S. Ct. 982, 128 A. L. R. 1044; *Russell v. N. Y. Produce Exchange*, 27 Misc. 381, 58 N. Y. S. 842; *Park & Sons Co. v. National Wholesale Druggists Ass'n*, 175 N. Y. 1, 67 N. E. 136; *Thompson v. New South Wales Branch* (1924), A. C. 764; and *Bohn Mfg. Co. v. Hollis*, 54 Minn. 223, 55 N. W. 1119.

Many of the cases which announce this rule, whether by way of *dictum* or otherwise, state no reason for the conclusion reached other than to cite one or two earlier decisions containing the same categorical statement. It appears likely that the rule of mere unenforcibility first developed in early times when the concept of contracts in restraint of trade was limited to those agreements whereby individuals voluntarily relinquished their rights to carry on a trade or calling. The courts would not grant affirmative protection at the request of any party to such contracts. This was merely an application of the doctrine of *pari delicto*. *Mc-*

*Carter v. Firemen's Ins. Co.,* 74 N. J. Eq. 372, 73 Atl. 80. Even as to parties *in pari delicto,* however, an exception was made where one party repudiated the agreement and sought affirmative protection, the theory being that relief was granted to the public through a party. 1 Story's Equity Jurisprudence (13th ed.) 302, § 298,

When the concept of restraint of trade began to be applied to contracts or combinations to restrain competition, to the detriment of third parties, some courts extended the rule of mere unenforcibility to cover actions brought by injured third parties. This was done notwithstanding the fact that the reason for the rule (application of *in pari delicto*) no longer applied. Later some courts, apparently realizing that the original basis for the rule did not justify its extension in this manner, began to find other reasons for withholding relief.

It was asserted that refusal to enforce the agreement provided ample protection of the public interest. Perhaps this was so with respect to voluntary restraints, and the early monopolies which were created by crown grant. It is certainly not true with regard to contracts between, or combinations of, individuals or corporations for the purpose of restraining outside competition. In the latter case it is the effective enforcement of the agreement by the combination, *without the need of court aid,* which causes the injury.

Another reason advanced to justify the application of this rule to injured third parties is stated in such cases as *Bohn Mfg. Co. v. Hollis, supra,* and *Mogul Steamship Co. v. McGregor* (1892), A. C. 25. The *Bohn* case appears to be the leading decision in this country in support of that rule, being often cited as the sole authority for the rule. As previously indicated, the announcement of the rule in that case was actually *dictum.* After holding that the defendants' combination was not in restraint of trade, the court held that "even if it were" this would not, of itself, give plaintiff a cause of action. The reason advanced in support of this view was that, while the agreement was unlawful in the sense that it was void as against public policy, it was not

a criminal offense. Without specifically so saying, the court apparently reasoned that, unless an act were a crime, it could not give rise to a cause of action at common law.

*Mogul Steamship Co. v. McGregor, supra,* was cited in support of the court's ruling. It is also cited in many other American cases which have reached the same result. This appears to be the leading English authority in support of the rule that there can be no affirmative relief. Even in that case the discussion of the point was probably *dictum.* Three of the six members of the House of Lords who rendered opinions expressly found that there was no restraint of trade, and only one specifically found that the case involved such a restraint. The specific reason given in the *Mogul* case why there could be no affirmative relief was that entry into a contract or combination in restraint of trade is not an indictable offense because not a crime or misdemeanor. Again the conclusion was apparently drawn, *sub silentio,* that only indictable offenses give rise to a cause of action at common law.

There is no general principle to the effect that an act must constitute a crime in order to provide a basis for equitable relief to one injured by the act. A cause of action arises when one party breaches a duty owed to another party, whereby the latter's interest or right is invaded. *Cowley v. Northern Pac. R. Co.,* 68 Wash. 558, 563, 123 Pac. 998; *McKee v. Dodd,* 152 Cal. 637, 93 Pac. 854, 855; 3 Foundations of Legal Liability, Street, 7. See, also, the cases noted in 1 Am. Jur. 419, Actions, § 24; 1 C. J. S. 984, Actions, § 8(e). If such invasion results in irreparable injury so that the remedy at law is inadequate, equitable relief is appropriate.

Article XII, § 22, provides the measure of that correlative right and duty involved in this case. It is not self-executing in the sense that a criminal prosecution can be grounded upon that provision alone. Nevertheless, as previously noted, it represents a clear-cut expression of public policy phrased in terms of command. Monopolies and trusts "shall never be allowed" in this state, and "no" incorporated company, copartnership, or association of persons in this

state "shall directly or indirectly" combine or make any contract for the prohibited purpose.

 The right established by this provision is the right of anyone to carry on his trade, calling or profession without interference by reason of contracts, combinations, or other arrangements of the kind defined. The duty there established is to refrain from invading this right by entering into or proceeding under any such contract, combination, or other arrangement. Thus, where that duty has been violated and that right has been invaded, there is present every necessary ingredient of a cause of action, as defined above.

That the violation of a policy declaration which does not amount to a criminal offense may give rise to a cause of action, is amply demonstrated by our decisions in *Gazzam v. Building Service Employees etc., Local 262,* 29 Wn. (2d) 488, 188 P. (2d) 97; 34 Wn. (2d) 38, 207 P. (2d) 699 (affirmed 339 U. S. 532); and *Ostroff v. Laundry & Dye Works Drivers Local No. 566,* 37 Wn. (2d) 595, 225 P. (2d) 419.

In both of these cases, equitable relief was accorded to the injured party. In the *Gazzam* case, monetary damages were also recovered. The cause of action in each case was grounded upon the violation of a declaration of policy in the labor disputes act to the effect that the individual unorganized worker shall be free from interference, restraint, or coercion of employers of labor or their agents in certain respects. Rem. Rev. Stat. (Sup.), § 7612-2 [P.P.C. § 695-3]. Needless to say, other provisions of the labor disputes act which tend to state a policy against the granting of affirmative relief have no counterpart in Article XII, § 22, relating to monopolies and trusts.

The numerical weight of authority may or may not support the view that there can be no affirmative relief for a third person injured by a combination in restraint of trade. In any event, there are a very considerable number of decisions which reach the contrary conclusion. Among these are *Reeves v. Decorah Farmers' Co-operative Society,* 160 Iowa 194, 140 N. W. 844; *Walsh v. Ass'n of Master Plumbers*

*of St. Louis,* 97 Mo. App. 280, 71 S. W. 455; *Carlson v. Carpenter-Contractors' Ass'n,* 305 Ill. 331, 137 N. E. 222, 27 A. L. R. 625; *Klingel's Pharmacy v. Sharp & Dohme,* 104 Md. 218, 64 Atl. 1029; and *Pratt v. British Medical Ass'n, supra.* Additional authorities, both pro and con, are reviewed in an annotation to be found in 92 A. L. R. 185. See, also, the decisions noted in 36 Am. Jur. 660, 665, Monopolies, Combinations, etc., §§ 204, 214, where it is indicated that the weight of authority favors the granting of affirmative relief both at law and in equity. The problem is reviewed in 3 Pomeroy's Equity Jurisprudence (5th ed.) 675, § 934a, and the conclusion is there stated that

". . . where the agreement is thus void, a court of equity may always exercise its jurisdiction defensively, by defeating a suit brought for the enforcement of the contract; or affirmatively, by granting the remedy of cancellation or of injunction when the defensive remedy at law would not be certain, complete, and adequate."

■ It will be observed that the courts which deny affirmative relief in equity do not do so on the ground that equity lacks jurisdiction. They simply hold that equity declines to exercise its jurisdiction for one or more of the reasons referred to above. We are of the view that, on both principle and authority, jurisdiction in equity should be exercised to grant affirmative relief where the contract or combination in restraint of competition results in irreparable injury to third persons. The same considerations lead us to conclude that monetary damages may also be recovered for such injury where the damage can be ascertained with reasonable certainty.

Respondents predicate another general objection to the granting of affirmative relief in this case upon the precedent established in *Porter v. King County Medical Society,* 186 Wash. 410, 58 P. (2d) 367. The plaintiff in that case was the employee of two physicians who had operated a private clinic for the purpose of engaging in contract practice. The principal defendant was the same King County Medical Society which is a respondent here. Porter alleged in his complaint that, through the enforcement of the same by-law

provisions which are here in question, the Society and its officers coerced the physicians who had operated the clinic to give up that activity. This resulted in the discharge of Porter, who had been employed on a commission basis under a terminable contract.

The trial court sustained a demurrer to the complaint and this court affirmed. It was held that, in pursuing its legitimate objects, an association has the right to coerce a member by fine, suspension, or expulsion, and the association will not, nor will its members, be liable in damages to those who may be directly or indirectly injured by such efforts.

Respondents argue that the identical situation exists in this case—the same association is enforcing the same by-laws in pursuit of the same objectives. While Porter stood in a different relationship to the Society than appellants do in this case, we do not believe that case ought to be distinguished on this narrow ground. The language and ruling of the court was broad enough to indicate that, had the physicians who conducted the clinic in the *Porter* case, rather than Porter himself, sought relief, it would have been held that they did not have a cause of action.

The gist of the action in the *Porter* case appeared to be that the defendants were guilty of the tort of inducing others not to deal. This is a well-recognized basis for the recovery of monetary damages. *Boutwell v. Marr*, 71 Vt. 1, 42 Atl. 607; *Martell v. White*, 185 Mass. 255, 69 N. E. 1085; *Krigbaum v. Sbarbaro*, 23 Cal. App. 427, 138 Pac. 364. The action could not succeed because, under the allegations of the complaint, the prime purpose was to serve the legitimate selfish interests of defendants and not to injure Porter or the physicians who operated the clinic. See 3 Restatement of Torts, § 766, comment (d).

It is pointed out in the opinion that the constitution and by-laws of the medical society constituted a contract between the members which the courts will enforce "if not immoral or contrary to public policy or the law of the land." The constitution and by-laws were assumed to be free from such stigma because the allegations of the complaint did not

justify a contrary assumption. Thus, the key to that decision lies in the court's conclusion that the association, in there enforcing its by-laws, was pursuing its legitimate objects.

On the pleadings which were there before the court, we believe this is the only conclusion which could have been reached. The by-laws of the association were pleaded, but only very vague and general allegations were made concerning the question of monopoly. The question of restraint of competition was not specifically put in issue in the pleadings, nor was it urged in Porter's brief on appeal. Accordingly, this issue was not dealt with in the opinion rendered by this court.

In the instant case, however, this broad issue of restraints of competition contrary to public policy was put in issue by the pleadings and extensively dealt with in the evidence. It is here established that the prime purpose behind respondents' entire course of conduct in this matter was to unduly restrain competition in the supplying of contract medicine in the King county area. Hence we cannot say here, as the court was required to assume in the *Porter* case, that respondents are only in pursuit of their "legitimate" interests. It is chiefly this factor which distinguishes the two cases and causes us to conclude that the *Porter* case is not here in point.

What has just been said makes it unnecessary to here review the numerous cases cited by respondents involving the reasonable operations of trade associations and their practices in disciplining members for the purpose of obtaining conformity to organizational policies. This also applies to the cases cited by respondents in which it was held that an individual may not compel his admission into a society or organization. In none of these cases was there involved an effort to utilize the association or organization for the purpose of fixing prices or curtailing production with the object of creating a monopoly.

Bearing in mind that the Sherman act is in essence a codification of the common law, we fully agree with the

following comment of the court in *United States v. American Medical Ass'n*, 110 F. (2d) 703, 712, made in dealing with this same contention:

"Organizations and rules which have as their purpose the improvement of conditions in any particular trade or occupation, and the regulation of relations between traders, are, as we have just pointed out, beneficial rather than detrimental to the public interest. But when these same organizations go so far as to impose unreasonable restraints on the operations in their field, they become subject to the prohibition of the Sherman act. Sugar Institute v. United States, 297 U. S. 553, 597-600, 56 S. Ct. 629, 80 L. Ed. 859."

■ Respondents argue, as a final general objection to the granting of any affirmative relief, that appellant Cooperative has been guilty of violating certain statutes and is operating *ultra vires*. Respondents seek to apply the doctrine of unclean hands, urging that equity should not grant relief to appellant Cooperative under these circumstances.

In support of this view, it is first contended that Medical Security Clinic, Inc., operated from the date of its incorporation until its purchase by the Cooperative on November 15, 1946, in violation of the insurance code, Rem. Rev. Stat., § 7147 [P.P.C. § 651-1]. It is further asserted that, from that date until the spring of 1947, when it registered under the newly-enacted health contractor act (Rem. Supp. 1947, § 6131-10 *et seq.*), the Cooperative, as sole owner of Medical Security Clinic, also operated in violation of the insurance code.

The instant suit was filed in November, 1949, two and a half years after the Cooperative registered as a health contractor. Respondents concede that the Cooperative has not been in violation of the insurance code during that period. In our opinion, it is immaterial, in so far as the defense of unclean hands is concerned, whether the Cooperative operated in violation of the insurance code during late 1946 and early 1947. We have therefore reached no conclusion as to whether the Cooperative was actually violating the code during that period.

Respondents call attention to the fact that the Cooperative is organized as a nonprofit corporation under Rem. Rev. Stat., § 3873. In this connection, it is urged that the co-operative is acting *ultra vires*, as it is the sole stockholder of Security Clinic, Inc., which is organized as a business corporation and is operating for profit.

We likewise find this contention without substance. The facts previously set out in this opinion indicate that Medical Security Clinic has not operated as a separate going concern since it was purchased by the Cooperative in November, 1946.

Again making reference to the fact that the Cooperative is organized under Rem. Rev. Stat., § 3873, respondents urge that the Cooperative's members receive a profit in the way of lessened cost for medical service. This, it is argued, means that the Cooperative is operated for profit and hence *ultra vires*. *State ex rel. Troy v. Lumbermen's Clinic*, 186 Wash. 384, 58 P. (2d) 812, is cited in support of this view.

In the *Lumbermen's Clinic* case, the court held that an organization of employers, incorporated as a nonprofit corporation, but for the prime purpose of saving expense to the incorporators in fulfilling their statutory duty of providing medical service and hospitalization for employees, was actually being operated for profit. The language of the opinion chiefly relied upon by respondents here reads as follows:

"Profit does not necessarily mean a direct return by way of dividends, interest, capital account, or salaries. A saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited. If respondent renders to its incorporators or members, or to businesses in which they are interested and in whose profits they share, a service at a cost lower than that which would otherwise be paid for such service, then respondent's operations result in a profit to its members." (p. 394.)

The difficulty in applying this principle in the case before us is that respondents, who have the burden of proof as to this affirmative defense, have failed to prove that the saving

of expense was the principal purpose of the members of the Cooperative and that its operations achieved that purpose. Co-operative medical plans of this kind are often referred to as methods of providing "low-cost" service. The fact is, however, that the primary purpose of such plans is to secure medical and hospital service on a risk-sharing basis. It may turn out to be low cost for the member who has required a great deal of service. It may be very high cost for another member who has paid his one-hundred-dollar initial fee and his monthly dues over a long period, but has required very little service.

It need only be added that the record affirmatively shows that the Cooperative's industrial contract practice and its membership contract practice are each paying their own way. While the industrial contract practice is vital to the economic welfare of the Cooperative, it is not providing a substantial margin of profit which inures to the benefit of the members. The record further shows that the operations of the Cooperative have not resulted in the amassing of a substantial surplus. Such excess of income over expenses as has been realized has been used to improve facilities and services. There have been no cash dividends or other emoluments to members of the Cooperative.

We are of the view that respondents have failed to establish that the Cooperative is operating for profit and therefore *ultra vires*. The affirmative defense of unclean hands has not been established.

We come now to a consideration of the affirmative relief to which appellants are entitled as against the Society, Bureau, Service Corporation, their named officers, and the members of the Bureau.

Several kinds of overt acts were alleged and proved in connection with the combination or arrangement in restraint of competition here found to exist. The two kinds of overt acts which are most effective and damaging in this connection are those relating to the exclusion of appellant physicians from membership in the Society, and those which tend to prevent or discourage members of the Society from

consulting with appellant physicians or rendering professional services in association with such physicians or for their contract patients or at Group Health Hospital.

It is our conclusion that the Society, its officers and board of directors should be enjoined from following any course of conduct, whether through observance of the provisions of Article III, § 8, of the Society's by-laws or otherwise, which will have the effect of excluding applicants from membership in the Society on the sole ground that they are practicing contract medicine in substantially the manner followed by appellants, as herein described.

It is our further conclusion that the Society, Bureau, Service Corporation, their officers, and members of the Bureau should be enjoined from following any course of conduct, whether through observance of the indicated by-law provisions or otherwise, which will have the effect of preventing or discouraging members of these organizations from consulting with appellant physicians, or rendering professional services in association with appellant physicians, or for the latters' patients, or at any hospital, on the sole ground that such physicians or such hospitals are practicing, or providing facilities for the practice of, contract medicine in substantially the manner followed by appellants, as herein described.

Another class of overt acts which has been particularly effective and damaging in connection with the restraints which respondents here sought to impose, relates to respondents' efforts to obtain the exclusion of appellants from hospital medical staffs. To the extent that this exclusion results automatically from hospital by-law provisions, or informal rules or custom, requiring membership in the Society as a qualification for staff membership, this will be remedied by the injunctive relief authorized above.

To the extent that this exclusion results from inability of appellant physicians to gain the endorsement of present members of the active staff, or of physicians at large, this can be remedied in this proceeding only with respect to such staff members and physicians at large who are respondents

herein. This, however, includes all members of the Bureau, who were herein sued through named members of the Bureau as representative of all other members.

 To the extent that appellants' exclusion is obtained through the efforts of the Society, Bureau, Service Corporation, their boards of trustees and officers, and members of the Bureau, in persuading or influencing the hospitals, their officers and medical staffs to take such action, relief may be accorded, since these parties are before the court. Respondents argue, however, that injunctive relief to prevent such efforts to persuade or influence the hospitals may not be granted, as it would violate fundamental principles of free speech. In this connection, respondents refer to many cases involving trade unions and industrial disputes.

We are convinced that the acts in question cannot be justified as an exercise of the right of free speech. This state has declared its public policy in Article XII, § 22, of our constitution. Respondents, in seeking to persuade or influence the hospitals in the manner indicated, have endeavored to thwart that policy. The situation is thus similar to that dealt with in *Building Service Union v. Gazzam*, 339 U. S. 532, 94 L. Ed. 1045, 70 S. Ct. 784. There the court upheld, as against this same argument, an injunction restraining the peaceful picketing which had for its object the transgression of the public policy of this state as declared by the legislature.

It is our conclusion that the Society, Bureau, Service Corporation, their boards of trustees and officers, and members of the Bureau, should be enjoined from following any course of conduct, of the kind described above or otherwise, which has for its purpose the exclusion of appellant physicians from the hospitals of King county (including Renton Hospital) on the sole ground that they are practicing contract medicine in substantially the manner followed by appellants, as herein described.

In our view, the injunctive relief authorized above will, in all likelihood, result in termination of the unlawful features of respondents' combination. We are therefore of the

opinion that it is not necessary at this time to provide equitable relief touching the other classes of overt acts in which respondents have been engaged, as found above.

The interests of the parties will be served, however, if the decree to be entered upon the remand of this case provides that the court shall retain jurisdiction (except with respect to Swedish Hospital) for a period of three years from date of entry of that decree. We so direct.

During that period, appellants may apply for such additional injunctive relief as may be shown to be necessary, under developing circumstances, in order to effectuate the discontinuance of the unlawful features of the combination. Respondents may likewise, during that period, apply for such determinations respecting the amendment of by-laws or otherwise as may be convenient and useful in ascertaining the permissible scope of their policies and activities.

Appellant Cooperative is not entitled to recover monetary damages against respondents, because it failed to establish proof of such damage with the required degree of certainty.

Appellant physicians sought recovery of monetary damages on the ground of libel and slander and actionable conspiracy to injure. It was contended that they were defamed by the use which respondents made of the word "unethical" to characterize the kind of practice in which appellants were engaged. It was also contended that agents and representatives of Service Corporation made derogatory and defamatory remarks regarding appellant physicians' professional standing and competence.

We have heretofore found that the word "unethical" was used by respondents in a special sense, not to indicate lack of professional morality, but only nonconformity with the Society's anticontract medicine policy. The use of this term was limited to discussions among the membership of the Society and its affiliates and with hospital officials. All of those who thus used the word "unethical," or heard it used, understood the restricted sense in which the term was used. Under these circumstances, we do not believe that respon-

dents' use of that term with reference to appellant physicians was libelous *per se*. The case would be otherwise had the record shown that respondents were characterizing appellants in this fashion before members of the lay public who could not be expected to understand the special meaning respondents were attaching to the term. We have also found that the derogatory statements which agents of Service Corporation made to the members of the lay public on several occasions were not libelous *per se*.

■ Appellant physicians have undoubtedly been put to some annoyance, embarrassment, and humiliation as a result of respondents' conduct in furtherance of their attempt to restrain competition. They were unable, however, to show special damage by way of loss of profits or otherwise. The reason for this was that they were employed full time by the Cooperative, and were not permitted to engage in private practice. It is this factor which distinguishes this case from *Pratt v. British Medical Society, supra*, where plaintiff physicians were granted judgments for monetary damages.

It is our conclusion that appellants are not entitled to recover monetary damages from respondents.

The question of whether appellants have established a cause of action against respondent Swedish Hospital can be quickly disposed of. Appellants base their case against Swedish Hospital on the claim that this institution was a part of the general combination or conspiracy to restrain competition. After an examination of the evidence, we have reached a contrary conclusion, as heretofore noted. Absent this element, there is no ground for relief at law or in equity.

■ Private hospitals have the right to exclude licensed physicians from the use of their facilities, such exclusion resting within the discretion of the managing authorities. *People v. The Julia F. Burnham Hospital*, 71 Ill. App. 246; *Harris v. Thomas*, 217 S. W. (Texas) 1068; *Levin v. Sinai Hospital of Baltimore City*, 186 Md. 174, 46 A. (2d) 298; 60 A. L. R. 656, annotation.

The final question presented is whether appellant physicians and appellant Huseland have a cause of action against Renton Hospital.

The complaint which these physicians make is that they were wrongfully excluded from the Renton Hospital staff. The complaint which appellant Huseland makes is that the effect of the wrongful exclusion of these physicians from the hospital staff was to deny to him, as a resident and taxpayer of the area, the right to use the facilities of this public hospital.

Appellant physicians were excluded from Renton Hospital pursuant to a by-law of the hospital which makes membership in the Society a prerequisite to membership on the hospital staff. As already indicated, injunctive relief will be granted under which appellant physicians will no longer be excluded from the Society on the sole ground that they are practicing "unauthorized" contract medicine. This will mean that the Renton Hospital by-law will no longer stand in the way of granting appellant physicians' applications for staff membership. It is therefore unnecessary to decide whether this by-law provision, making membership in the Society a prerequisite of membership on the medical staff, amounts to an unconstitutional delegation of administrative power.

The facts revealed in this case, however, do not warrant the conclusion that removal of the Society by-law obstacle will necessarily result in these applications for staff status being granted. While Renton Hospital is not a part of the combination in restraint of competition, the record nevertheless discloses that the present members of the medical staff are in full sympathy with the objects of that combination and are opposed to opening the doors of Renton Hospital to appellant physicians. The record also indicates that the respondent commissioners feel themselves bound by the action of the medical staff. It is therefore permissible to assume that, if this by-law no longer stands as a bar to appellant physicians, some other way may be found to exclude them. It has been shown that, at other King county

hospitals, such exclusion was obtained by a variety of methods.

■ Courts will not by injunction interfere with the exercise of discretionary powers conferred by the state upon municipal corporations, acting through their duly appointed officers, merely because such action may be unwise, or a mistake of judgment. *State ex rel. Gebhardt v. Superior Court*, 15 Wn. (2d) 673, 131 P. (2d) 943.

However, where the acts of public officers are arbitrary, tyrannical, or predicated upon a fundamentally wrong basis, then courts may interfere to protect the rights of individuals. *Moore v. Spokane*, 88 Wash. 203, 152 Pac. 999; *State ex rel. Yeargin v. Maschke*, 90 Wash. 249, 155 Pac. 1064; *In re Grandview*, 118 Wash. 464, 203 Pac. 988; *State ex rel. York v. Board of County Commissioners*, 28 Wn. (2d) 891, 184 P. (2d) 577, 172 A. L. R. 1001; *In re California Avenue*, 30 Wn. (2d) 144, 190 P. (2d) 738.

■ Having regard to the findings previously made, and to the fact that we are concerned with a public hospital, it is our conclusion that exclusion of appellant physicians from the staff of Renton Hospital upon the sole ground that they are practicing contract medicine in substantially the manner now followed by appellants, is unreasonable, arbitrary, capricious, and discriminatory.

Accordingly, Renton Hospital, its officers and agents, including respondent commissioners and respondent doctors attached to the medical staff of that hospital, should be enjoined from following any course of conduct having for its purpose such exclusion of appellant physicians from the medical staff of Renton Hospital.

This disposition of the matter makes it unnecessary to decide two other questions which were argued: Does the medical staff of Renton Hospital have a veto power in the selection of staff members? Is Renton Hospital acting in a governmental or proprietary capacity? The persons who are acting for this municipal corporation in the selection of medical staff members may not do so in an unreasonable, arbitrary, capricious, or discriminatory manner, whether such persons be the elected commissioners or the members

of the medical staff, and whether the hospital is being operated in governmental or proprietary capacity.

The judgment is affirmed as to Swedish Hospital. It is reversed as to all other respondents, and remanded with instructions to enter a decree conforming to the views expressed in this opinion.

SCHWELLENBACH, C. J., MALLERY, HILL, GRADY, DONWORTH, and WEAVER, JJ., concur.

FINLEY and OLSON, JJ., did not participate.

---

January 24, 1952. Petition for rehearing denied.