Honorable Terry Bergeson Superintendent of Public Instruction P. O. Box 47200 Olympia, Washington 98504-7200
Dear Dr. Bergeson:
By letter previously acknowledged, you requested our opinion on a question we have rephrased for clarity as follows:
Does RCW 28A.320.015 authorize a school district (assuming compliancewith its procedural requirements) to adopt and administer a policyauthorizing the district to engage in fundraising activities, including(1) soliciting gifts and donations; (2) entering into interlocalagreements with other governments which generate additional funds forschool district activities; and/or (3) operating various enterprisesconsisting of the sale of goods or services to generate revenue for thedistrict?
 BRIEF ANSWER
We answer your question in the qualified affirmative. As a general matter, a school district may engage in fundraising activities under the authority granted by RCW 28A.320.015, where the activity in question is related to the educational purposes served by the school district. These activities might take a variety of forms and might be based on a variety of types of legal authority. We decline to attempt to define the precise limits of the authority granted by RCW 28A.320.015.
 ANALYSIS
As described in the information you submitted along with your question, a number of school districts are interested in engaging in various fundraising activities or are already doing so.[1] Questions have arisen concerning the extent to which districts have sufficient statutory authority to engage in these fundraising activities. In referring this matter to us for an opinion, you ask us to consider especially RCW28A.320.015(1), a statute which reads as follows:
The board of directors of each school district may exercise the following:
(a) the broad discretionary power to determine and adopt written policies not in conflict with other law that provide for the development and implementation of programs, activities, services, or practices that the board determines will:
(i) Promote the education of kindergarten through twelfth grade students in the public schools; or
(ii) Promote the effective, efficient, or safe management and operation of the school district;
(b) Such powers as are expressly authorized by law; and
(c) Such powers as are necessarily or fairly implied in the powers expressly authorized by law.
We note, initially, that parts (b) and (c) of this subsection restate and affirm language consistently used by the courts to describe the powers of a school district. Tunstall v. Bergeson, 141 Wn.2d 201, 5 P.3d 691
(2000); Noe v. Edmonds Sch. Dist. 15, 83 Wn.2d 97, 515 P.2d 977 (1973). Accord AGO 1989 No. 5. Like other municipal and quasi-municipal corporations, school districts need either express or implied statutory authority to engage in a particular activity.
If parts (b) and (c) restate the case law, part (a) of RCW 28A.320.015
must have been intended to grant additional authority to schools districts beyond that which they had previously enjoyed. Courts accord meaning, if possible, to every word in an ordinance or statute. State v.Lundquist, 60 Wn.2d 397, 374 P.2d 246 (1962); Group Health Coop. v. KingCy. Med. Soc'y, 39 Wn.2d 586, 237 P.2d 737 (1952).
Furthermore, you have provided us with legislative history indicating that the Legislature intended to grant additional powers in adopting RCW28A.320.015. This statute originated as Laws of 1992, ch. 141, § 301. This chapter was a broad "education reform" bill (SSB 5953) which included a number of provisions about education. Sections 101 through 104 revised the standards and requirements for the teaching profession. Sections 201 through 203 created a new commission for student learning and defined its powers and duties. Sections 401 through 403 revised high school graduation requirements. Sections 501 through 506 revised the basic education laws in several ways. Section 301, the statute under examination here, was grouped with two other statutes revising school board powers. Laws of 1992, ch. 141, §§ 301, 302, 303.
The 1992 legislation was a broad "educational reform" act, and the Legislature evidently intended that school districts have broader local authority, either so they could better handle the additional responsibilities imposed by Laws of 1992, ch. 141 itself or so they would have more flexibility in performing the general duties assigned to school districts. For instance, the 1992 Final Legislative Report on SSB 5953 (which became Laws of 1992, ch. 141), contains the following language about section 301, which became RCW 28A.320.015:
School boards are given broad discretionary power to adopt policies (that are not in conflict with other laws) that provide for the development and implementation of programs and practices that benefit the education of citizens and promote the effective, efficient, or safe maintenance and operation of school district programs, activities, services, or practices.
Final Legislative Report, 52nd Leg., Reg. Sess. (1992), at 105. In addition, the notes of committee hearings indicate that school district advocates and the Superintendent of Public Instruction supported the increased flexibility for school districts which they saw contained in the language eventually enacted as RCW 28B.320.015.[2]
We do not need to decide here precisely what powers school districts may exercise under RCW 28A.320.015 that they could not previously exercise. We will consider the question only as it relates to school district fundraising practices. Because there are a number of different ways school districts could raise funds, this subject alone provides the opportunity for a fairly extensive analysis of school district authority. For analytical purposes, we break fundraising proposals into three categories: 1) solicitation of gifts and donations, 2) intergovernmental contracts, and 3) "enterprise" activities designed to raise revenue for a district.
A. Solicitation of gifts and donations.
One obvious way for a school district to obtain private funds is to ask for them. Solicitation could take a number of forms, ranging from a line or two in the school newsletter to an aggressive program similar to those used by colleges and universities. As to this activity, your question is whether RCW 28A.320.015 would allow a school to adopt a policy providing for certain types of gift solicitation, based on a finding either that (1) the activity would promote the education of district students, (2) the activity would promote the effective, efficient, and safe management of the district, or (3) the power to conduct the activity is necessarily or fairly implied from some express school district power.
In this connection, we note first that school districts have authority to accept, receive, and administer "for scholarship and student aid purposes" gifts, grants, conveyances, devises, and bequests of personal or real property, in trust or otherwise, and to sell, lease, rent, or exchange and invest or expend the proceeds, rents, profits and income from such gifts. RCW 28A.320.030. The question is whether the authority to accept and use gifts implies the authority to solicit them for scholarship and student aid purposes.
In AGO 1993 No. 18, an opinion addressing several questions about fund-raising by state-supported colleges and universities, we approached this issue with some caution. We did conclude in that opinion that colleges and universities had authority to solicit private gifts and donations for two reasons: (1) they had express statutory authority to accept donations; and (2) colleges and universities, including publicly-owned institutions, have a long history and tradition of seeking private donations to supplement their other sources of funding. Therefore, we concluded that colleges and universities had the power to solicit donations for the general benefit of the institution. AGO 1993 No. 18, at 5.
We cannot apply quite the same analysis to the question of solicitation of donations by school districts. While schools have (like colleges) the authority to accept donations, we are unaware of any parallel history in which school districts have commonly relied on private gifts and donations for a significant portion of their operations. Our impression is that the practice of donating money or property to school districts has been occasional or sporadic and not (as with colleges) a common practice. However, we do think that the express authority for school districts to accept and manage donations "for scholarship and student aid purposes" fairly implies the authority to solicit donations for those specific purposes. Since RCW 28A.320.015(1)(c) authorizes activities which are necessarily or fairly implied for express grants, this statute at least bolsters any pre-existing authority based directly on RCW 28A.320.030
as to scholarship and student aid solicitations.[3]
The next question is whether RCW 28A.320.015 provides a basis for additional authority — such as the authority to solicit donations for school district purposes beyond "scholarship and student aid". This statute, as noted above, grants "broad discretionary power" for school districts to adopt policies promoting education or promoting the effective, efficient, and safe operation of the district. To the extent a district adopts a policy relating the solicitation of donations to one of the purposes specified in RCW 28A.320.015(1)(a), this statute provides supplemental authority. However, we caution that the statute requires a district to show a link between the activity engaged in and some specific district purposes encompassed in the statutory language.
Accordingly, we conclude that school districts do have authority to engage in the solicitation of donations from private sources where the activity is related to the purpose and objects of the district, as set forth either in RCW 28A.320.030 or in RCW 28A.320.015(1)(a) (or in some other specific statute granting authority to districts) and is reasonably related to the pursuit of such objects.
B. Performance of interlocal service agreements with other governmentalentities.
In connection with your opinion request, we were provided with a list of sample school district fundraising activities. Some of them involve entering into cooperative agreements with other school districts or other governmental entities, with an intent to raise funds for the school district. Here are two examples from the list:
1. Several school districts would enter into a cooperative printing agreement to reduce printing costs for individual districts and make more efficient use of staff and equipment.
2. A school district would enter into a agreement with a city whereby the district's transportation shop would perform maintenance on city vehicles as well as district vehicles, thereby promoting efficient use of resources and providing the district with an additional source of funds.
We note that while these and similar ideas might either save money or provide additional revenue to a district, intergovernmental agreements are not classic "fundraising" arrangements. They do not produce revenue from the private sector but produce it from dealings with other units of government. Furthermore, the Interlocal Cooperation Act, RCW 39.34, permits a broad array of intergovernmental agreements for all local governments in Washington, including school districts. Both of the examples given would fall well within the activities authorized by this law. In this case, the authority does not arise from RCW 28A.320.015 but from whatever statute authorizes the underlying activity (owning and maintaining vehicles, printing documents) coupled with the authority granted by RCW 39.34 to act jointly or cooperatively.
Accordingly, we conclude that the school districts have authority to generate revenue through intergovernmental agreements, assuming that the agreement is of a nature permitted by RCW 39.34 or by some other statute.[4]
C. Selling goods or services to the general public.
The materials submitted with the opinion request listed a number of fundraising ideas that amount to various "enterprises" in which school district personnel or students will sell goods or provide service to the general public, charging fees which will be used for various district purposes.[5] The materials include the following examples:
1. Selling plants grown by the horticulture students, glass art made by art students, or picnic tables made by wood shop students.
2. Performing automotive repair services through the vocational education program.
3. Charging the public for drama and music performances by students.
4. Charging fees for summer school, pre-school, and other educational programs which are not part of the basic education curriculum.
5. Operating a sandwich shop or coffee bar.
With the possible exception of the fifth example (discussed below), all of the examples listed concern charging the public for goods produced or services performed as a part of the school district's educational program. If a school district offers horticultural, art, or shop classes, students might well produce plants, art, and shop objects in the ordinary course of their studies. Selling these objects to the general public provides the district with an additional source of revenue (to the extent that the revenue exceeds the cost of the program in question), but it also provides the district with a way to dispose of the items produced by the students (items which otherwise might be given away or even discarded), educates the public about school district programs, and may provide students with additional educational opportunities in marketing the items. Much the same analysis applies to services performed as a part of student education, such as automotive repair, computer work, and food preparation. Charging fees for drama and music performances, should a school district choose to do so, provides revenue while contributing to the arts in the community and, again, may enhance the students' educational experience directly or indirectly. In all of these cases, we are convinced that a school district could after following the procedures set forth in RCW 28A.320.015(2) adopt a policy authorizing such activities upon finding that the activity would promote K-12 education, would promote the effective, efficient, or safe management and operation of the school district, or both under RCW 28A.320.015(1)(a).
Charging fees for summer school or other programs which are not state-mandated presents slightly different issues but, again, it appears to be within a school district's statutory authority if the program is an extension or enhancement of the basic curriculum. Summer school might provide additional educational opportunities for district students beyond those available as a part of the regular curriculum. Preschool programs "lead into" the district's K-12 program and may better prepare young children for the district's regular elementary school program. In both of these cases, the recipients of the program are either children who are already served by the regular K-12 program or children who soon will be a part of the program.
The sandwich shop and coffee bar presents different issues, depending on how this activity is tied to the educational program. If the shop is an outlet for students in food preparation programs, the analysis above would apply. The sandwich shop could also be an outlet for students who are learning not food handling but business and marketing skills, in which case it would, again, be an outgrowth of an educational program. The sandwich shop could be located in the school so that most of its customers are students and the general public served only occasionally; in that case, it would not be a fundraising activity so much as an incidental extension of the school lunch program.
However, we are skeptical that the language of RCW 28A.120.015, despite the broad terms used, was intended by the Legislature to authorize school districts to engage in any enterprise calculated to raise funds where the enterprise bears no connection (except financial) to the school district's educational program. Suppose, for instance, that a school district simply purchased an existing sandwich shop, located at some distance from any school, and offered food service to the general public, staffing the shop with district employees. This activity, if well-conducted, might produce revenue for the district, but it would in no sense arise out of the district's educational mission. RCW 28A.120.015 was enacted as part of a reform act which imposed new educational standards on districts. Its intent was to provide flexibility to districts in meeting their new challenges but not to allow districts to turn themselves into roving entrepreneurs. Without this implied limit, districts could operate interstate trucking lines, engage in speculative purchases of real estate, or offer residential water and sewer service.[6]
We conclude, then, that districts have broad discretion to engage in fundraising activities that arise out of their educational functions, particularly where the activities themselves might be a part of the education program or might enhance students' educational experiences. Beyond this general series of observations, we cannot analyze all the possible ideas school districts might have and offer our views whether they would be authorized by RCW 28A.320.015 or by other statutes. As a general matter, however, we believe the courts would authorize activities which (1) relate in some way to the statutory powers and duties of the district, (2) are proportional in scope to the role they play in the district's total pattern of activity, and (3) do not (expressly or by implication) conflict with some other provision of statutory law.
We trust the foregoing will be of assistance to you.
Very truly yours,
 JAMES K. PHARRIS Senior Assistant Attorney General
[1] For purposes of this opinion, we will use the term "fundraising" to include any activities a school district might engage in to generate revenue from the general public for school district activities, but not including taxation, distributions from federal and state governments, or charges to students for goods and services related to their education (towel and locker fees, lunch charges, activity fees, etc.). Some specific types of fundraising are discussed later in the analysis.
[2] For example, Marcia Costello, SPI legislative liaison, testified in a house hearing on HB 2546 (a bill very similar to SB 5953) that "the Superintendent strongly supports the enhancement of local flexibility that's embodied in the bill's language, particularly as it relates to waivers and to local school board powers." Washington State House Educ. Comm., Staff Report and Testimony on HB 2546, at 2 (Jan. 20, 1992). Atthe same hearing, Dwayne Slate testified on behalf of the WashingtonSchool Directors Association that the bill's general design was to"[d]evelop some state standards on what students should know, and how toassess whether or not those standards have been met, and then loosen upthe local school people and the local communities to decide how best tomake sure that that happens." Id.
[3] This formulation differs from the case law which restricted school districts to those powers necessarily implied in or incident to powers expressly granted, or those powers essential to carrying out the declared legislative objects and purposes of the district. See, e.g., SeattleSch. Dist. 1 v. Int'l Union, 88 Wn. App. 205, 210, 944 P.2d 1062 (1997).
[4] Before going on, we do note that interlocal cooperative activity isnot expected to generate profit for any party, because governments wouldexpect to deal with each other on a shared actual costs basis. See RCW43.09.210, which generally requires that services performed by one agencyfor another be at their actual cost. State v. Grays Harbor Cy.,98 Wn.2d 606, 656 P.2d 1084 (1983). We concluded in an earlier opinionthat transfers of property between local governments under RCW 39.33 (notat issue here) should be at "full value" because of RCW 43.09.210. SeeAGO 1997 No. 5. We do not directly reach the issue here with respect toRCW 39.34. Our assumption is that districts would act cooperatively withother governments to save money through added efficiency and economies ofscale rather than by charging "profit" for services performed.
[5] We assume that your question is confined to fundraising activities conducted by the school district itself — through employees or through students during the course of their education. There is a long tradition of fundraising conducted by parent organizations or other private groups who support the schools. Fundraising by private parties is beyond the scope of this discussion.
[6] The courts recognize limitations on the powers of a localgovernment even when acting under fairly broad statutory authority. Forinstance, in Port of Seattle v. Wash. Util. Transp. Comm'n,92 Wn.2d 789, 597 P.2d 383 (1979), the Supreme Court found that the port district lacked authority to operate an airporter service, despite statutory language authorizing the operation of an airport and a long list of related activities.